No. 23-2723

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

EIDO HUSSAM AL-NAHHAS

*Plaintiff-Appellee,*

v.

777 PARTNERS LLC and TACTICAL MARKETING PARTNERS, LLC,

*Defendants-Appellants.*

---

Appeal from the United States District Court
for the Northern District of Illinois
Case No. 1:22-cv-00750
The Honorable John J. Tharp Jr., District Judge

---

## BRIEF AND SUPPLEMENTAL APPENDIX OF
## PLAINTIFF-APPELLEE

---

Daniel A. Edelman
Tara L. Goodwin
Julie Clark
Matthew J. Goldstein
**EDELMAN, COMBS,**
**LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
courtecl@edcombs.com

*Counsel for Plaintiff-Appellee*

---

**ORAL ARGUMENT REQUESTED**

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2723

Short Caption: Eido Hussam Al-Nahhas v. 777 Partners LLC, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Eido Hussam Al-Nahhas

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Edelman, Combs, Latturner & Goodwin, LLC

(3)   If the party, amicus or intervenor is a corporation:

    i)      Identify all its parent corporations, if any; and

       N/A

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

       N/A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Daniel A. Edelman       Date: December 11, 2023

Attorney's Printed Name: Daniel A. Edelman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑   **No** ☐

Address: 20 S. Clark Street, Suite 1500, Chicago, IL 60603

Phone Number: 312-739-4200       Fax Number: 312-419-0379

E-Mail Address: dedelman@edcombs.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2723

Short Caption: Eido Hussam Al-Nahhas v. 777 Partners LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐　　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Eido Hussam Al-Nahhas

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Edelman, Combs, Latturner & Goodwin, LLC

(3)　　If the party, amicus or intervenor is a corporation:

i)　　Identify all its parent corporations, if any; and

N/A

ii)　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Tara L. Goodwin　　　　Date: December 11, 2023

Attorney's Printed Name: Tara L. Goodwin

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　Yes ☐　No ✓

Address: 20 S. Clark Street, Suite 1500, Chicago, IL 60603

Phone Number: 312-739-4200　　　　Fax Number: 312-419-0379

E-Mail Address: tgoodwin@edcombs.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2723

Short Caption: Eido Hussam Al-Nahhas v. 777 Partners LLC, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Eido Hussam Al-Nahhas

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Edelman, Combs, Latturner & Goodwin, LLC

_____

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Dulijaza Clark                     Date: December 11, 2023

Attorney's Printed Name:  Dulijaza Clark

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address:  20 S. Clark Street, Suite 1500, Chicago, IL 60603

Phone Number: 312-739-4200                    Fax Number:  312-419-0379

E-Mail Address: jclark@edcombs.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2723

Short Caption: Eido Hussam Al-Nahhas v. 777 Partners LLC, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

 Eido Hussam Al-Nahhas

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

 Edelman, Combs, Latturner & Goodwin, LLC

(3)   If the party, amicus or intervenor is a corporation:

   i)   Identify all its parent corporations, if any; and

     N/A

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

     N/A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 N/A

Attorney's Signature: /s/ Matthew J. Goldstein          Date: December 11, 2023

Attorney's Printed Name:  Matthew J. Goldstein

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [ ]   **No** [✓]

Address:  20 S. Clark Street, Suite 1500, Chicago, IL 60603

Phone Number: 312-739-4200          Fax Number:  312-419-0379

E-Mail Address: mgoldstein@edcombs.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................viii

JURISDICTIONAL STATEMENT.........................................................1

STATEMENT OF THE ISSUES............................................................4

STATEMENT OF THE CASE................................................................5

     A.    Procedural History ...............................................................6

SUMMARY OF ARGUMENT..............................................................14

ARGUMENT......................................................................................15

I.     STANDARD OF REVIEW.......................................................15

II.    LITIGATION-CONDUCT BASED WAIVER QUESTIONS
      ARE FOR THE COURTS .......................................................15

III.   THE 777 DEFENDANTS WAIVED ANY RIGHT TO COMPEL
      ARBITRATION ..................................................................... 16

     A.    The 777 Defendants Did Not Act with Diligence and
           Substantially Delayed Their Request for Arbitration....................17

     B.    The 777 Defendants Actively Participated in the Litigation ..........20

     C.    Plaintiff Suffered Prejudice .......................................................22

IV.   WHETHER NON-SIGNATORIES CAN ENFORCE AN ARBITRATION
      AGREEMENT IS A QUESTION FOR THE COURTS ..............................23

V.    THE DISTRICT COURT CORRECTLY APPLIED ILLINOIS LAW TO
      DETERMINE THAT THE 777 DEFENDANTS CANNOT ENFORCE
      THE ARBITRATION AGREEMENT AS NON-SIGNATORIES....................24

     A.    The 777 Defendants Have Waived the Choice-of-Law Issue .........25

     B.    If This Court Finds that the Choice-of-Law Issue was Not
           Waived, the District Court Should be Affirmed Because the
           777 Defendants Failed to Establish an Actual Conflict
           Necessitating a Choice-of-Law Determination .............................26

C.    The 777 Defendants Cannot Enforce a Choice-of-Law Clause in a Contract to Which They Are Not Parties ..............................27

D.    Illinois Law Cannot be Waived and Tribal Law Does Not Apply ........................................................................29

VI.    THE 777 DEFENDANTS ARE NOT ENTITLED TO ENFORCE THE ARBITRATION AGREEMENT AS NONPARTIES UNDER ANY THEORY .......................................................................30

A.    The 777 Defendants are Not Third Party Beneficiaries of the Contract...............................................................................30

B.    The 777 Defendants Concede That They Are Not Agents Of ZocaLoans...............................................................................32

C.    Equitable Estoppel Does Not Apply ............................................34

VII.    THE DELEGATION PROVISION IS UNENFORCEABLE .........................34

A.    The Validity of an Arbitration Agreement Depends on State Law...............................................................................35

B.    An Arbitration Agreement that Disclaims State and Federal Law is Unenforceable ......................................................36

VIII.    THE ARBITRATION AGREEMENT IS UNENFORCEABLE AS IT PROSPECTIVELY WAIVES PLAINTIFF'S FEDERAL AND STATE STATUTORY RIGHTS AND REMEDIES..................................................38

A.    An Arbitration Agreement that Waives Statutory Rights is Unenforceable...............................................................................42

B.    Federal and State Rights Cannot be Vindicated Under Tribal Law...............................................................................43

IX.    THE ARBITRATION AGREEMENT IS UNENFORCEABLE AS IT IS UNCONSCIONABLE AND VIOLATIVE OF ILLINOIS PUBLIC POLICY ...............................................................................45

A.    The Arbitration Agreement is Substantively Unconscionable .......45

       i.     The Illinois Predatory Loan Prevention Act Applies to a Predatory 693.10% Loan Made by an Unlicensed, Out-of-State Lender to an Illinois Consumer Over the Internet ...............................................................46

       ii.    The Predatory Loan Prevention Act Expressly Prevents Consumers From Giving Up Their Rights Under the Act ....49

       iii.   The Illinois Interest Act and Consumer Fraud Act Also Apply ...................................................................51

   B.    The Underlying Agreement is Unenforceable as it is Violative of Public Policy....................................................... ...................52

X.     CONCLUSION.............................................................................53

CERTIFICATE OF COMPLIANCE...................................................54

CERTIFICATE OF SERVICE............................................................55

SUPPLEMENTAL APPENDIX TABLE OF CONTENTS......................56

SUPPLEMENTAL APPENDIX..........................................................57

## <u>TABLE OF AUTHORITIES</u>

### Cases

*155 Harbor Drive Condo. Ass'n v. Harbor Point Inc.,*
    209 Ill. App. 3d 631, 568 N.E.2d 365 (1st Dist. 1991) ....................... 32

*A.D. v. Credit One Bank, N.A.,*
    885 F.3d 1054 (7th Cir. 2018) .............................................. 15, 24, 27

*Al-Nahhas v. Rosebud Lending LZO,* 22cv750,
    2023 U.S. Dist. LEXIS 149969 (N.D. Ill. Aug. 25, 2023) ...................... 2

*American Express Co. v. Italian Colors Rest.,*
    570 U.S. 228 (2013) ...................................................... 33, 34, 39,40

*Anderson v. Boy Scouts of Am., Inc.,*
    226 Ill. App. 3d 440, 589 N.E.2d 892 (1992) ......................................33

*Arteaga v. United States,*
    711 F.3d 828 (7th Cir. 2013) ............................................. 20

*Arthur Andersen L.L.P. v. Carlisle,*
    556 U.S. 624 (2009) ........................................... 25, 27, 35

*Asner v. Hengle,*
    212 L. Ed. 2d 795, 142 S. Ct. 2093 (2022) ...................................... 35

*AT&T Mobility LLC v. Concepcion,*
    563 U.S. 333 (2011) ................................................... 33, 36

*Auto-Owners Ins. Co. v. Websolv Computing, Inc.,*
    580 F.3d 543 (7th Cir. 2009) ............................................. 15

*Balt. Orioles, Inc. v. Major League Baseball Players Ass'n,*
    805 F.2d 663 (7th Cir. 1986) ............................................. 25

*Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.,*
    2014 IL 116389,10 N.E.3d 902 ......................................... 25

*Belleville Toyota v. Toyota Motor Sales, U.S.A.,*
    199 Ill. 2d 325, 351, 770 N.E.2d 177, 194 (2002) ............................... 25

*B-S Steel of Kan. v. Tex. Indus.,*
    439 F.3d 653 (10th Cir. 2006)............................................ 29

*Cabinetree of Wis. v. Kraftmaid Cabinetry,*
    50 F.3d 388 (7th Cir. 1995) ................................................ 13, 17, 18

*Camp v. TNT Logistics Corp.*,
  553 F.3d 502 (7th Cir. 2009) ........................................................... 26

*Cardoso v. Robert Bosch Corp.*,
  427 F.3d 429 (7th Cir. 2005) ........................................................... 38

*CCC Intelligent Solutions Inc. v. Tractable Inc.*,
  36 F.4th 721 (7th Cir. 2022) ........................................................... 24

*Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*,
  216 Ill. 2d 366, 837 N.E.2d 48 (2005) ............................................... 52

*Chemtool, Inc. v. Lubrication Techs.*,
  148 F.3d 742 (7th Cir. 1998) ........................................................... 33

*Corbett v. DRH Cambridge Homes, Inc.*, 04cv3344,
  2005 U.S. Dist. LEXIS 14989, 2005 WL 1838456 .............................. 20

*Dillon v. BMO Harris Bank, N.A.*,
  856 F.3d 330 (4th Cir. 2017) ..................................................... 39, 40

*Ernst & Young L.L.P. v. Baker O'Neal Holdings, Inc.*,
  304 F.3d 753 (7th Cir. 2002) ..................................................... 15, 16

*Ervin v. Nokia, Inc.*,
  349 Ill. App. 3d 508, 812 N.E.2d 534 (5th Dist. 2004) ................. 33, 34

*Felder v. Casey*,
  487 U.S. 131 (1988) ........................................................................ 25

*F.H. Paschen/S.N. Nielsen, Inc. v. Burnham Station, L.L.C.*,
  372 Ill. App. 3d 89, 865 N.E.2d 228 (1st Dist. 2007) ......................... 31

*First Nat'l Bank v. Malpractice Research*,
  179 Ill. 2d 353, 688 N.E.2d 1179 (1997) ........................................... 51

*First Options of Chi., Inc. v. Kaplan*,
  514 U.S. 938 (1995) ................................................................. 31, 36

*Fitzgerald v. Wildcat*, 3:20cv00044,
  2023 U.S. Dist. LEXIS 145245 (W.D. Va. Aug. 18, 2023) .................. 41

*Fyrnetics Ltd. v. Quantum Grp., Inc.*,
  293 F.3d 1023 (7th Cir. 2002) ......................................................... 15

*Gibbs v. Haynes*,
  967 F.3d 332 (4th Cir. 2020) ........................................................... 41

*Gibbs v. Sequoia Cap. Operations, LLC,*
    966 F.3d 286 (4th Cir. 2020) ...................................................... *passim*

*Gibbs v. Stinson,*
    421 F. Supp. 3d 267 (E.D. Va. 2019) ................................................ 37

*Gingras v. Think Fin., Inc.,*
    922 F.3d 112 (2d Cir. 2019) ...................................................... *passim*

*Gonzalez v. Volvo of Am. Corp.,*
    752 F.2d 295 (7th Cir. 1985) ........................................................... 27

*Hanc & Brubaker Holdings v. Nxt LVL Servs., L.L.C.,* 22cv1526,
    2023 U.S. Dist. LEXIS 14410 (N.D. Ill. Jan. 27, 2023) ...................... 27

*Harris v. FSST Mgmt. Servs., LLC,* 22cv01063,
    2023 U.S. Dist. LEXIS 138601 (N.D. Ill. Aug. 9, 2023) ................ 41, 45

*Hayes v. Delbert Servs. Corp.,*
    811 F.3d 666 (4th Cir. 2016) ...................................................... *passim*

*Hengle v. Treppa,*
    19 F.4th 324 (4th Cir. 2021) ...................................................... *passim*

*Hengle v. Asner,*
    433 F. Supp. 3d 825 (E.D. Va. 2020) .......................................... 41, 45

*Henson v. U.S. Dist. of N. Cal. (In re Henson),*
    869 F.3d 1052 (9th Cir. 2017) ........................................................ 28

*Illinois. Rico Indus. v. TLC Grp., Inc.,*
    2018 IL App (1st) 172279, 123 N.E.3d 567 ....................................... 42

*In Re: BankWest, Inc. Motion to Quash,* 3:23mc00012,
    2023 U.S. Dist. LEXIS 78104 (D.S.D. May 2, 2023) ............................ 9

*In re Scarlett Z.-D.,*
    2015 IL 117904, 28 N.E.3d 776 ....................................................... 27

*Jackson v. Payday Fin., LLC,*
    79 F. Supp. 3d 779 (N.D. Ill. 2015) .................................................. 52

*Jackson v. Payday Fin., L.L.C.,*
    764 F.3d 765 (7th Cir. 2014) ................................................ 29, 37, 45

*Kawasaki Heavy Indus. v. Bombardier Rec. Prods.,*
    660 F.3d 988 (7th Cir. 2011) ..................................................... 17, 43

*Kaiser Steel Corp. v. Mullins,*
    455 U.S. 72 (1982) ........................................................................ 35

x

*Kaufman v. Am. Express Travel Related Servs. Co.*, 07cv1707,
    2008 U.S. Dist. LEXIS 18129 (N.D. Ill. Mar. 7, 2008).......................... 28

*Korean Am. Broad. Co. v. Korean Broad. Sys.*, 09cv6665,
    2012 U.S. Dist. LEXIS 44353, (N.D. Ill. Mar. 29, 2012) ...................... 50

*K.F.C. v. Snap Inc.*,
    29 F.4th 835 (7th Cir. 2022) ............................................................ 24

*Lukis v. Whitepages Inc.*,
    535 F. Supp. 3d 775 (N.D. Ill. 2021) .............................................15, 16

*MacDonald v. Cash Call, Inc.*, 16cv2781,
    2017 U.S.Dist. LEXIS 64761, 2017 WL 1536427 .............................. 37

*MacDonald v. CashCall, Inc.*,
    883 F.3d 220 (3d Cir. 2018) ........................................... 31, 35, 37, 43

*Maher & Assocs., Inc. v. Quality Cabinets*,
    267 Ill. App. 3d 69, 640 N.E.2d 1000 (2d Dist. 1994) ........................ 50

*Maldonado v. Creative Woodworking Concepts, Inc.*,
    342 Ill. App. 3d 1028, 796 N.E.2d 662 (3d Dist. 2003) ...................... 28

*Maremont Corp. v. Cheshire*,
    288 Ill. App. 3d 721, 681 N.E.2d 548 (1st Dist. 1997) ....................... 28

*Martis v. Grinnell Mut. Reinsurance Co.*,
    388 Ill. App. 3d 1017, 905 N.E.2d 920 (3rd Dist. 2009) ......................31

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
    514 U.S. 52 (1995) ..........................................................................31

*McCoy v. Iberdrola Renewables, Inc.*,
    760 F.3d 674 (7th Cir. 2014) ..................................................... 25, 26

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*,
    473 U.S. 614 (1985) ...................................................... 33, 34, 39, 40

*Momient-El v. DeTella*,
    118 F.3d 535 (7th Cir. 1997) .......................................................... 25

*Montana v. United States*,
    450 U.S. 544 (1981) ....................................................................... 29

*Morgan v. Sundance, Inc.*,
    142 S. Ct. 1708 (2022) ........................................................... *passim*

*Nucap Indus., Inc. v. Robert Bosch L.L.C.*,
    273 F. Supp. 3d 986 (N.D. Ill. 2017) ................................................ 28

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014) ...........................................................29

*O'Connor v. Ford Motor Co.*, 19cv5045,
    2023 U.S. Dist. LEXIS 3340 (N.D. Ill. Jan. 9, 2023) .......................... 24

*Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*,
    769 F.3d 105 (2d Cir. 2014) ............................................................. 29

*Paragon Micro, Inc. v. Bundy*,
    22 F. Supp. 3d 880 (N.D. Ill. 2014) ................................................... 27

*Preston v. Ferrer*,
    552 U.S. 346 (2008) ........................................................................ 40

*Razor v. Hyundai Motor Am.*,
    854 N.E.2d 607 (2006) ....................................................................45

*Rico Indus. v. TLC Grp., Inc.*,
    2018 IL App (1st) 172279, 123 N.E.3d 567 .........................................51

*Rent-A-Ctr., W., Inc. v. Jackson*,
    561 U.S. 63 (2010) .......................................................................... 35

*Rideout v. CashCall, Inc.*, 2:16cv3817,
    2018 U.S. Dist. LEXIS 37908, 2018 WL 1220565 .............................. 41

*Ryan v. Delbert Servs. Corp.*, 5:15cv05044,
    2016 U.S.Dist. LEXIS 121246, 2016 WL 4702352 ................. 33, 38, 41

*Schnabel v. Trilegiant Corp.*,
    697 F.3d 110 (2d Cir. 2012) ............................................................. 29

*Scheurer v. Fromm Family Foods L.L.C.*,
    863 F.3d 748 (7th Cir. 2017) ...................................................... 24, 34

*Smith v. Adams & Assocs.*, 14cv5522,
    2015 U.S. Dist. LEXIS 138670 (N.D. Ill. Oct. 9, 2015) ....................... 22

*Smith v. GC Servs. Ltd. P'ship*,
    907 F.3d 495 (7th Cir. 2018) ........................................... 17, 18, 19, 20

*Smith v. W. Sky Fin., LLC*,
    168 F. Supp. 3d 778 (E.D. Pa. 2016) ......................................37, 38, 41

*Sosa v. Onfido, Inc.*,
    8 F.4th 631, 637 (7th Cir. 2021) ................................................. *passim*

*Sphere Drake Ins. v. Am. Gen. Life Ins. Co.*,
    376 F.3d 664 (7th Cir. 2004) ............................................................ 33

*St. Mary's Med. Center, Inc. v. Disco Aluminum Prods. Co.,*
 969 F.2d 585 (7th Cir. 1992) ...................................................... 17, 18

*Thornton v. M7 Aero. LP,*
 903 F. Supp. 2d 654 (N.D. Ill. 2012) ................................................. 27

*Titus v. BlueChip Fin.,*
 786 F. App'x 694 (9th Cir. 2019) ...................................................... 41

*Titus v. ZestFinance, Inc.,* 18cv5373,
 2018 WL 5084844 (W.D. Wash. Oct. 18, 2018) ....................................41

*Townsend v. Sears, Roebuck & Co.,*
 227 Ill. 2d 147, 879 N.E.2d 893 (2007) ............................................ 47

*Viking River Cruises, Inc. v. Moriana,*
 142 S.Ct. 1906 ...................................................... 34, 39, 40

*Warciak v. Subway Rests., Inc.,*
 880 F.3d 870 (7th Cir. 2018) ................................................. 25, 30, 24

*Water Applications & Sys. Corp. v. Bituminous Cas. Corp.,*
 2013 IL App (1st) 120983, 986 N.E.2d 124..........................................28

*Williams v. Medley Opportunity Fund II, LP,*
 965 F.3d 229 (3d Cir. 2020) .................................................. 40, 42, 43

*Wright-Moore Corp. v. Ricoh Corp.,*
 908 F.2d 128 (7th Cir. 1990) ............................................................ 49

## Statutes and Rules

9 U.S.C. § 2  .............................................................. 2, 35, 36

9 U.S.C. § 3  .............................................................. 16, 24, 35

9 U.S.C. § 4 ...................................................................35

9 U.S.C. § 16 ................................................................... 2

18 U.S.C. § 1962 .............................................................. 41

18 U.S.C. § 1964 ............................................................ *passim*

28 U.S.C. § 1331 ............................................................... 1

28 U.S.C. § 1332 ............................................................. 1, 2

28 U.S.C. § 1337 ............................................................... 1

28 U.S.C. § 1367 ............................................................... 1

720 ILCS 5/17-59 ................................................................ 52

815 ILCS 123/15-1-1 ......................................................... 4, 6

815 ILCS 123/15-1-5 .......................................................... 48

815 ILCS 123/15-1-10 ........................................................ 47

815 ILCS 123/15-5-5 ...........................................................48

815 ILCS 123/15-5-10 ........................................................ 48

815 ILCS 123/15-5-15 ....................................................48, 51

815 ILCS 123/15-10-5 ........................................................ 49

815 ILCS 123/15-10-25 ................................................... 49, 50

815 ILCS 205/4 ................................................................... 52

815 ILCS 205/6 ............................................................... 6, 52

815 ILCS 205/8 ................................................................... 52

815 ILCS 505/1 ........................................................... *passim*

815 ILCS 505/10c ........................................................ 49, 50

Fed. R. Civ. P. 26 ............................................................. 8, 9

Local Rule 37.2 .............................................................. 8,9,11

*Restatement 2d, Conflict of Laws,* § 6(1) .................................... 46

Seventh Circuit Rule 28 ......................................................... 1

## JURISDICTIONAL STATEMENT

Defendants-Appellants 777 Partners LLC ("777 Partners") and Tactical Marketing Partners, LLC's ("Tactical") (together, the "777 Defendants") jurisdictional statement is not complete and correct. Pursuant to Seventh Circuit Rule 28(b), Plaintiff-Appellee Eido Hussam Al-Nahhas ("Plaintiff") submits the following jurisdictional statement.

On February 10, 2022, Plaintiff filed this case in the United States District Court for the Northern District of Illinois against Defendants-Appellants 777 Partners and Tactical as well as Defendant Rosebud Lending LZO d/b/a ZocaLoans ("ZocaLoans"). Plaintiff alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964, and Illinois usury and consumer protection statutes. The District Court had subject matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. § 1964, 28 U.S.C. § 1337, and 28 U.S.C. § 1367.

The District Court also had jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Plaintiff alleged that jurisdiction may exist under CAFA and that is indeed the case. The requirements for CAFA jurisdiction are satisfied because (1) the aggregate number of members of the proposed class is 100 or more, (2) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (3) the parties are minimally diverse, and (4) none of CAFA's exceptions apply.

The 777 Defendants stated in their Opening Brief and Second Amended

Docketing Statement that "there are more than 10,000 loans that would fall within Plaintiff's putative class. The 777 Defendants also state that the total amount of those loans made by ZocaLoans exceeds $12,000,000." (777 Br. 2; Doc. 15).[1] Additionally, ZocaLoans was at the time of suit filing an entity organized under the law of the Rosebud Sioux Tribe located in South Dakota with its principal place of business in Miami, Florida. (ECF 1, ("Complaint" or "Compl."), ¶7).[2] Accordingly, ZocaLoans was (and is) a citizen of South Dakota and Florida for purposes of minimal diversity under CAFA. *See* 28 U.S.C. § 1332(c)(1). Plaintiff was at the time of suit filing (and continues to be) a citizen of the state of Illinois for purposes of minimal diversity under CAFA. (Compl. ¶6). Thus, minimal diversity under CAFA is satisfied. *See* 28 U.S.C. § 1332(d)(2)(A).

The United States Court of Appeals for the Seventh Circuit has jurisdiction pursuant to 9 U.S.C. § 16(a) of the Federal Arbitration Act ("FAA") because this is an appeal from an order denying a motion to compel arbitration, which was entered by the District Court on August 25, 2023. (ECF 124; SA001). The decision is reported at 2023 U.S. Dist. LEXIS 149969 and 2023 WL 5509320. There were no motions filed that would toll the time within which to appeal. The 777 Defendants filed their Notice of Appeal with the District Court on August 29, 2023. (ECF 126). The District Court's arbitrability order is immediately

---

[1] This brief cites the District Court docket, which is the record on appeal, as "ECF," Appellants' Opening Brief as "777 Br.," Appellants' Short Appendix as "SA," Appellants' Separate Appendix as "DA," Appellee's Supplemental Appendix as "Al-Nahhas Appx.," and the docket on appeal as "Doc."
[2] ZocaLoans maintains that it is a citizen of South Dakota. (ECF 19 at 2).

appealable under the FAA.

## **STATEMENT OF THE ISSUES**

1.    Whether the District Court erred in finding that the 777 Defendants waived any purported right to compel Plaintiff to arbitrate his claims where they actively participated in the litigation and failed to either raise arbitration or file a motion to compel arbitration for a period of fourteen months despite having actual knowledge of the provision, which Plaintiff attached to his complaint?

2.    Whether, under applicable Illinois law, the 777 Defendants have standing to enforce an arbitration agreement as non-signatories where they are not express intended third party beneficiaries of the contract, agents of the contracting party, and where the requirements of equitable estoppel are not met?

3.    Whether an arbitration agreement that disclaims state and federal law is enforceable?

4.    Whether enforcement of the loan contracts' tribal choice-of-law provision violates Illinois' public policy as expressed in the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-1-1?

## STATEMENT OF THE CASE

This case concerns online loans made and collected in Illinois by a lending enterprise that does business as ZocaLoans. The loans impose triple-digit interest rates, exponentially higher than the 9% interest rate cap for loans made by an unlicensed lender under Illinois law. (ECF 1-2 at 11; DA031). By way of example, one of Plaintiff's loans had an interest rate of 693.10% – over *seventy-five* times the legal limit in Illinois – requiring him to pay $1,206.68 in finance charges on a $550 loan over a period of four months. (*Id.*). Plaintiff is one of thousands of financially challenged Illinois residents to whom similar loans have been made. All of the loans at issue are both civilly and criminally usurious under Illinois law.

This is the latest in a series of cases in which operators of low-dollar, high interest lending websites have tried to evade liability for illegal loans by cloaking their operations in tribal law. Here, ZocaLoans purports to be shielded from state and federal laws due to a claim of tribal sovereign immunity as a supposed arm of the Rosebud Sioux Tribe. However, the purported "tribal" lending entity is a facade for the illegal lending scheme; all substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals and entities that are unaffiliated with the tribe. ZocaLoans operates out of Miami, Florida for the benefit of 777 Partners, LLC, a Miami-based private equity firm.

Over the last decade, "[c]ourts across the country have confronted" these "transparent attempts to deploy tribal sovereign immunity to skirt state and federal consumer protection laws." *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019). A key component of these schemes involves crafting arbitration contracts "in which borrowers are forced to disclaim the application of federal and state law in favor of tribal law," which is often "exceedingly favorable to the tribal lending entity" and which permit no recourse against its business partners. *Id.* at 126-27.

So too here. Although the 777 Defendants make no claim of tribal affiliation, they seek to enforce a contract which renounces state and federal law in favor of the law of a tribe that has nothing to do with the underlying transactions and which has no jurisdiction to enact laws governing off-reservation conduct. This appeal is the latest attempt to enforce one of these "tribal" arbitration contracts.

## A.    Procedural History

On February 10, 2022, Plaintiff filed the underlying lawsuit. (ECF 1). Plaintiff, for himself, and on behalf of a class of similarly situated individuals, sought a declaratory judgment that loans made in the name of ZocaLoans are void and an injunction against their collection (Count I), damages pursuant to the Illinois Interest Act, 815 ILCS 205/6 (Count II), damages, injunctive, and declaratory relief pursuant to the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 *et seq.* and the Illinois Consumer Fraud Act, 815 ILCS 505/1

(Count III) (the Predatory Loan Prevention Act provides that violations are a violation of the Illinois Consumer Fraud Act), and treble damages under RICO, 18 U.S.C. § 1964 (Count IV). (*Id.*).

Tactical was served on February 15, 2022 (ECF 5), 777 Partners on February 18, 2022 (ECF 6), and ZocaLoans executed a waiver of service dated May 6, 2022 (ECF 9).[3] On March 14, 2022, the District Court granted the 777 Defendants and ZocaLoans' counsel's motion for leave to appear *pro hac vice*. (ECF 7, 8). On July 6, 2022, the 777 Defendants and ZocaLoans filed a motion seeking an extension of time to file a responsive pleading. (ECF 10). The District Court granted the motion (ECF 11) and directed the 777 Defendants to respond, as requested, by August 4, 2022. (*Id.*). They failed to do so. (ECF 12). On August 9, 2022, Plaintiff filed a motion requesting the entry of a default order. (*Id.*). The District Court granted Plaintiff's motion. (ECF 13). On August 18, 2022, the 777 Defendants and ZocaLoans filed an unopposed motion to set aside the default. (ECF 14). The District Court granted the motion and, per the 777 Defendants and ZocaLoans' request, set a responsive pleading deadline of September 1, 2022. (ECF 15).

On September 1, 2022, the 777 Defendants and ZocaLoans answered Plaintiff's complaint, demanded a trial by jury, and raised five affirmative defenses. (ECF 16). Arbitration was not among them. (*Id.* at 6-7; SA009). A week

---

[3] Plaintiff and ZocaLoans have reached a settlement and will move to dismiss ZocaLoans in the next several weeks.

later, the parties filed their joint initial status report and case management plan. (ECF 19). In the report, the parties asked the District Court to adopt their proposed case management plan and set deadlines to: (i) serve Rule 26 disclosures, (ii) amend the pleadings and join parties, (iii) complete fact discovery (iv) file a motion for class certification, and (v) file dispositive motions. (*Id.*).[4] The report said nothing about arbitration. (*Id.*). The District Court adopted the parties' proposed deadlines, entered a scheduling order, and referred the case to Magistrate Judge Fuentes for discovery scheduling and supervision as well as settlement. (ECF 20, 21).

Plaintiff served his first discovery requests on October 5, 2022 (777 Partners and ZocaLoans) and October 10, 2022 (Tactical). (ECF 47 at 2; ECF 47-1 at 2, 49). Consistent with the scheduling order (ECF 20), Plaintiff served his initial disclosures on September 23, 2022. (ECF 38 at 2).

On November 16, 2022, Oscar Gomez, then counsel of record for all defendants in the action, filed a motion seeking leave to withdraw. (ECF 23). The motion was granted on November 29, 2022. (ECF 29). Scott Clair appeared for the 777 Defendants on November 23, 2022 (ECF 27), and, on November 29, 2022, Patrick O. Daugherty sought leave to appear *pro hac vice* for the 777 Defendants (ECF 28). The motion was granted (ECF 30), and Mr. Daugherty entered his appearance the following day (ECF 32).

---

[4] In that report, the 777 Defendants stipulated that venue in the Northern District of Illinois was proper. (ECF 19).

The 777 Defendants and Plaintiff participated in a status conference with the District Court on December 21, 2022 (ECF 34) and filed a joint status report the following day (ECF 35). After conferring, the parties filed a subsequent report on January 19, 2023 (ECF 38) in which the 777 Defendants represented to the District Court that they were "working to prepare Rule 26 disclosures and respond to the discovery propounded by Plaintiff." (*Id.* at 2).

On January 27, 2023, the 777 Defendants and Plaintiff filed an agreed motion requesting that the District Court extend by ninety days the parties' deadlines to amend the pleadings, file a motion for class certification, and file dispositive motions. (ECF 40). The District Court granted the motion and adopted the modified case management schedule. (ECF. 41). Magistrate Judge Fuentes separately extended the deadline to complete fact discovery by sixty days. (ECF 39).

Plaintiff served a second round of written discovery requests upon 777 Partners on February 13, 2023 (777 Br. 5), and a second set of requests to Tactical on February 15, 2023 (*id.*). Prior to April 11, 2023, Plaintiff issued eleven third party subpoenas resulting in the production of tens of thousands of documents at great expense. (ECF 84 at 7; ECF 84-5 at 17).

On March 3, 2023, Plaintiff issued a subpoena to BankWest, Inc. ("BankWest"). (ECF 108 at 3). Shortly before the return date, BankWest filed a motion to quash in the U.S. District Court for the District of South Dakota. *In Re: BankWest, Inc. Motion to Quash*, 3:23mc00012, 2023 U.S. Dist. LEXIS 78104

9

(D.S.D. May 2, 2023). After holding a hearing, Chief Judge Lange ordered BankWest to comply with the subpoena, produce an affidavit of completeness, and mark the documents it produced as confidential subject to the protective order. (*Id.*).

On April 18, 2023, Plaintiff served a subpoena on First Republic Bank (ECF 111 at 2) and later initiated a miscellaneous action in the District of Oregon to compel First Republic Bank's compliance with the same. (*In re: Subpoena to First Republic Bank*, 3:23-mc-00535 (Dist. Oregon)). After the date for compliance had passed, and after having already filed a motion to quash in the Northern District of Illinois which was denied for want of jurisdiction (ECF 106, 111, 112), the 777 Defendants filed a motion to quash in the case Plaintiff initiated. (*See* ECF 111 at 3). With the consent of the subpoena respondent, both motions were eventually transferred to the Northern District of Illinois. (*In re: Subpoena to First Republic Bank*, 1:23-cv-07940 (N.D. Ill.)). Numerous other subpoenas were served between April and August 2023. (*See* 4:23-mc-09007-SRB (W.D. Mo.); 4:23-mc-09007-SRB (D. Nev.)).

On May 4, 2023, the 777 Defendants filed a motion to quash a subpoena directed to Truist Bank, and, on May 5, 2023, they filed a motion to quash one of the subpoenas Plaintiff served upon JPMorgan Chase Bank, N.A. (ECF 77, 78). Both motions were denied without prejudice for failure to comply with Local Rule 37.2. (ECF 79).

On March 3, 2023, Plaintiff moved for an order compelling discovery from

10

the 777 Defendants. (ECF 47). Plaintiff's counsel had conferred with counsel for the 777 Defendants on at least four occasions prior to March 3, 2023. (ECF 47). Magistrate Judge Fuentes set a hearing on Plaintiff's motion but advised the parties that if an agreement as to the date of service of the 777 Defendants' responses was reached, and notice of the same communicated to the court by March 6, 2023, the hearing would be vacated. (ECF 48). The 777 Defendants thereafter agreed to serve "full and complete" responses to Plaintiff's discovery requests by March 27, 2023. (ECF 49). Consistent with Magistrate Judge Fuentes's order, the 777 Defendants and Plaintiff filed a joint status report advising the court of the same. (*Id.*). Magistrate Judge Fuentes thereafter denied Plaintiff's motion as moot, struck the March 7 hearing, and ordered the 777 Defendants to serve – by agreement – full and complete responses by March 27, 2023. (ECF 50). They failed to do so. (ECF 59). As a result, Plaintiff filed a motion to enforce and for sanctions. (*Id.*).

On March 9, 2023, the parties filed a Joint Motion for Entry of a Confidentiality Order as they anticipated discovery would include confidential and commercially sensitive information. (ECF 51). Magistrate Judge Fuentes granted the parties' motion (ECF 52) and entered the Agreed Confidentiality Order (ECF 53). The next day, March 10, 2023, Plaintiff served his third set of discovery requests upon 777 Partners. (777 Br. at 5). 777 Partners responded to those requests on April 10, 2023. (*Id.*)

On April 7, 2023 – fourteen months after this case was filed – ZocaLoans

filed a motion to compel arbitration (ECF 54), memorandum of law in support (ECF 55), and a motion to stay discovery (ECF 56). Four days later, on April 11, 2023, the 777 Defendants filed a motion to compel arbitration (ECF 62), memorandum of law in support (ECF 63), and a motion to stay discovery (ECF 64). Also, on April 7, 2023, as noted above, Plaintiff filed a motion to enforce and for sanctions. (ECF 59). The District Court set a briefing schedule on the motions to compel arbitration (ECF 61, 66), and Magistrate Judge Fuentes set a hearing on the motions to stay and the motion to enforce (ECF 57, 60, 65).

After hearing argument, Magistrate Judge Fuentes denied the 777 Defendants and ZocaLoans' motions to stay discovery (ECF 67), concluding:

> I think I've heard enough to know that I'm going to deny this motion in my discretion under Rule 1, under the *Jones* case. I really feel like the amount of time that has been allowed to pass here through really I think not the fault, at least entirely, of counsel who have appeared today, but through the parties' actions in not responding to discovery earlier and allowing this amount of time to go by I think is enough for me at this point to say, no… we're going to go ahead and let this continue. (ECF 69; ECF 84-5 (Exhibit E); Al-Nahhas Appx.25).

Plaintiff's motion to enforce was granted in part and denied in part. (ECF 67).

Plaintiff filed a motion for leave to file an amended complaint on June 1, 2023. (ECF 95). The motion has been fully briefed. (ECF 95, 103, 104, 105). The 777 Defendants took no position with respect to Plaintiff's motion for leave to amend. (ECF 104 at 1).

On August 11, 2023, Plaintiff filed a notice of supplemental authority with respect to the 777 Defendants and ZocaLoans' motions to compel arbitration. (ECF 113). The District Court took the notice under advisement (ECF 115) and

ordered that any response be filed by August 19. (*Id.*). Having successfully petitioned the District Court for an extension of time (ECF 118, 120), the 777 Defendants filed their response on August 22, 2023 (ECF 122).

On August 25, 2023, the District Court denied the 777 Defendants' motion to compel arbitration (ECF 124; SA001). The District Court held that:

> The 777 Defendants cannot compel Al-Nahhas to arbitrate for two independent reasons. By acting inconsistently with the right to arbitrate—namely, by waiting more than a year to raise the prospect of arbitration and leading plaintiff on a futile discovery pursuit in the meantime—the 777 Defendants waived any right to arbitrate Al-Nahhas' claims. But even had they raised a right to arbitrate "at the earliest possible opportunity," *Cabinetree*, 50 F.3d at 391, their motion would fail because the 777 Defendants were not signatories to the Loan Agreements and have not demonstrated that any nonparty enforcement doctrine should apply under Illinois law. Accordingly, they cannot invoke any benefit that agreement confers and their motion to compel arbitration is denied. (ECF 124 at 21; SA021).

All proceedings have been stayed pending this appeal. (ECF 132).

## SUMMARY OF THE ARGUMENT

The District Court correctly concluded that litigation-conduct based waiver questions are for the courts. Even if such questions are for an arbitrator, because Plaintiff specifically challenged the validity of the delegation provision on grounds that it disclaimed all state and federal law, the District Court properly decided the question.

As the proper decision maker, the District Court did not err in concluding that to the extent the 777 Defendants had any right to compel Plaintiff to arbitrate his claims, such right had been waived given the 777 Defendants' fourteen-month delay in raising arbitration and because they led Plaintiff on a discovery chase.

Second, even if the 777 Defendants did not waive any purported right to arbitrate, under applicable Illinois law, as nonparties they are not entitled to enforce the arbitration agreement under any theory. Because questions of who may enforce a contract are for the courts – and because the delegation provision is part of an arbitration agreement that is unenforceable as it disclaims all state and federal law – the District Court was the proper decision maker.

Finally, assuming that the District Court erred in its finding of waiver, and even if the 777 Defendants are entitled to enforce the contract as nonparties under applicable Illinois law (they are not), this Court should affirm because the arbitration agreement is unenforceable as it operates as a prospective waiver of state and federal statutory rights and remedies and because it is unconscionable.

14

The delegation provision is unenforceable as it requires an arbitrator to determine whether a valid and enforceable arbitration agreement exists without access to the body of law necessary to make that determination. As the 777 Defendants noted, these issues were fully briefed below. (777 Br. 27). This Court should affirm the District Court.

## ARGUMENT

### I.     STANDARD OF REVIEW

"The factual determinations that a district court predicates a finding of waiver upon are reviewed for clear error, while the legal question of whether the conduct amounts to waiver is reviewed de novo." *Ernst & Young L.L.P. v. Baker O'Neal Holdings, Inc.*, 304 F.3d 753, 756 (7th Cir. 2002); *accord Fyrnetics Ltd. v. Quantum Grp., Inc.*, 293 F.3d 1023, 1027 (7th Cir. 2002). A district court's order as to the applicability of equitable estoppel should be reviewed for an abuse of discretion. *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1059 (7th Cir. 2018). A district court's choice-of-law decision is reviewed de novo. *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 546 (7th Cir. 2009).

### II.    LITIGATION-CONDUCT BASED WAIVER QUESTIONS ARE FOR THE COURTS

Waiver through litigation conduct or delay is an issue for a court to decide. The Supreme Court recently held that courts decide questions of litigation-based conduct waiver. *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1711 (2022) (when faced with delay in compelling arbitration "the court faces a question: Has the defendant's request to switch to arbitration come too late?").

15

The "FAA says so." *Lukis v. Whitepages Inc.*, 535 F. Supp. 3d 775, 785-86 (N.D. Ill. 2021). 9 U.S.C. § 3 commands courts to stay proceedings pending arbitration provided that "the applicant for the stay is not in default in proceeding with such arbitration." As the District Court noted, many courts have interpreted "default" as used in 9 U.S.C. § 3 to include the concept of waiver through litigation-related conduct. *Lukis*, 535 F. Supp. 3d at 785-86 (collecting cases).

Even if such questions are for an arbitrator, because the delegation provision is unenforceable (*see infra* Point VII) – and because Plaintiff specifically challenged it – the District Court properly decided arbitrability.

## III.   THE 777 DEFENDANTS WAIVED ANY RIGHT TO COMPEL ARBITRATION

This Court should affirm the District Court's finding of waiver. Assuming the 777 Defendants had a contractual right to compel Plaintiff to arbitrate his claims (which they do not, *see infra* Point VI.), the 777 Defendants waived any such right because they "acted inconsistently with any right to arbitrate." *Ernst & Young L.L.P.*, 304 F.3d at 756 (internal quotation marks omitted). The 777 Defendants litigated for fourteen months before raising their supposed right to arbitrate based on the ZocaLoans agreements to which they are not parties.

The right to compel arbitration of a dispute may be waived, as with any other contractual right. *Morgan*, 142 S. Ct. at 1713-14 (holding that there is no basis for special, arbitration-favoring rules) ("If an ordinary procedural rule – whether of waiver or forfeiture or what-have-you – would counsel against

16

enforcement of an arbitration contract, then so be it. The federal policy is about treating arbitration contracts like all others, not about fostering arbitration. . . .”). Waiver “is, if not strictly a factual question, an application of a legal standard to a set of facts.” *St. Mary's Med. Center, Inc. v. Disco Aluminum Prods. Co.*, 969 F.2d 585, 588 (7th Cir. 1992).

While many factors bear on this analysis, “diligence or the lack thereof is particularly important.” *Smith v. GC Servs. Ltd. P'ship*, 907 F.3d 495, 499 (7th Cir. 2018). As this Court stated, the question is whether “the party seeking arbitration … [did] all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration[].” *Cabinetree of Wis. v. Kraftmaid Cabinetry*, 50 F.3d 388, 391 (7th Cir. 1995). Courts also consider “whether the allegedly defaulting party participated in litigation, substantially delayed its request for arbitration, or participated in discovery.” *Smith*, 907 F.3d at 499 (*quoting Kawasaki Heavy Indus. v. Bombardier Rec. Prods.*, 660 F.3d 988, 994 (7th Cir. 2011)). Considering the totality of the circumstances, including the extensive third-party discovery, the 777 Defendants acted inconsistently with any right to arbitrate. The District Court should be affirmed.

### A. The 777 Defendants Did Not Act with Diligence and Substantially Delayed Their Request for Arbitration.

The District Court's finding that the 777 Defendants waived any right to arbitrate was not erroneous. The underlying case was filed on February 10, 2022. (ECF 1). The 777 Defendants did not move to compel arbitration until April 11,

2023, *over fourteen months* later. (ECF 62). But it is not just that the 777 Defendants failed to file a motion during this time. They also never privately demanded arbitration and never raised the issue before the District Court.[5] (ECF 84 at 8; SA021). Indeed, the specter of arbitration was not raised *at all* prior to April 11, 2023. (ECF 84 at 8). Further, the 777 Defendants answered the complaint, raised affirmative defenses, and demanded a trial by jury. (ECF 16). Arbitration was not mentioned. (*Id.*). The District Court, quoting *Cabinetree of Wis.*, 50 F.3d at 389, found that, given the 777 Defendants' delay and litigation conduct, their motion to compel was tantamount to dropping "a bombshell." (SA013).

As the District Court noted, the 777 Defendants "cannot claim that they were unaware of the arbitration provisions at any point in this proceeding." (SA012 n.5). Plaintiff attached the loan agreements containing the arbitration agreement as exhibits to his complaint. (ECF 1-2 at 1-36; DA021). The 777 Defendants clearly did not assert arbitration at the "earliest feasible" time. *Cabinetree of Wis.*, 50 F.3d at 391. *See also St. Mary's Med. Center, Inc.*, 969 F.2d at 590 (finding a 10-month delay in asserting right to arbitrate amounted to waiver where the delay did not stand alone).

The 777 Defendants blame everyone but themselves for their own litigation conduct. They ask this Court to reverse the District Court's finding of waiver on

---

[5] While the 777 Defendants claim that they demanded arbitration on March 9, 2023, they failed to proffer any evidence below to substantiate the claim. Instead, they fault Plaintiff for his inability to prove a negative. (777 Br. 13 fn. 8).

the basis that they "couldn't unilaterally determine a defense strategy." (777 Br. 13). But that doesn't excuse their failure to assert their purported right to arbitrate, especially because they knew about the arbitration provision. Nor does the excuse explain why they did not raise arbitration even once, let alone explain the fourteen-month delay in filing their motion to compel arbitration. *See Smith*, 907 F.3d at 500 (finding defendant's explanation for its delay in demanding arbitration "inadequate" where it knew an arbitration agreement likely existed but failed to investigate). This conspicuous silence indicates that the 777 Defendants' choice to litigate was what it seems: deliberate. What's more, the excuses don't make sense.

First, the 777 Defendants filed their motion to compel arbitration four days after ZocaLoans. There was no joint defense strategy. Indeed, Magistrate Judge Fuentes noted that they could have just joined ZocaLoans' motion, and perhaps that would have saved money and time. (ECF 84-5 at 6). They didn't.

Second, the 777 Defendants have had complete continuity of representation. Mr. Clair appeared on November 23, 2022, before Mr. Gomez's motion for leave to withdraw was granted, and Mr. Daugherty sought leave to appear *pro hac vice* on November 29, 2022—the same day the District Court granted Mr. Gomez leave to withdraw. (ECF 23, 27, 29, 30, 32). While the 777 Defendants blame prior counsel for their delay, the District Court easily dismissed that explanation as inadequate: "It is axiomatic that an attorney's acts as agent are attributable to the clients as principals." (SA011). The 777

Defendants' counsel's failure to raise arbitration cannot excuse the delay. *Arteaga v. United States*, 711 F.3d 828, 834 (7th Cir. 2013) ("That an attorney's conduct of the suit is inadequate may be grounds for a malpractice action against the attorney, but it is certainly no basis for requiring the [plaintiff] to pay the price of opposing counsel's dereliction."). As the District Court correctly concluded, a party that sleeps on its purported rights does not act with diligence. *See Smith*, 907 F.3d at 500 (finding defendant acted inconsistently with right to arbitrate when it waited eight months to demand arbitration from the filing of suit). *See also Corbett v. DRH Cambridge Homes, Inc.*, 04cv3344, 2005 U.S. Dist. LEXIS 14989, at *1 (N.D. Ill. July 26, 2005) (finding waiver where the defendant failed to raise arbitration as an affirmative defense and sought arbitration eight months after it filed its answer).

### B.    The 777 Defendants Actively Participated in the Litigation.

In addition to the 777 Defendants' fourteen-month delay in raising arbitration, they also "led [Plaintiff] on a…discovery chase." (SA012). By the time the 777 Defendants filed their motion to compel arbitration, Plaintiff had "obtained substantial discovery…and learned that the underlying lending operation [] is run by non-tribal persons out of Miami, Florida, that the lion's share of the profits from th[e] enterprise flows to the[] [777 Defendants] in the ballpark of around $400 million and that the tribe receives a nominal sum." (ECF 82-5 at 16).

Plaintiff obtained the above information as he served three sets of written

20

discovery requests on the 777 Defendants and served eleven subpoenas on third parties, all prior to the motion to compel arbitration (ECF 84 at 7). The 777 Defendants responded or objected to the first, second, and third sets of discovery requests and produced hundreds of pages of documents. (*Id.*). In addition, counsel for the 777 Defendants conferred with Plaintiff's counsel regarding discovery on at least four occasions prior to March 3, 2023 (the date of Plaintiff's first motion to compel discovery), and never once mentioned arbitration. (ECF 47 at 3).

The 777 Defendants submit that they participated in discovery only after being ordered to do so. That is false, and the record reflects as much. Mr. Daugherty stated at the April 12, 2023 hearing before Magistrate Judge Fuentes that "the 777 [D]efendants have not and are not refusing to participate in the discovery process." (Al-Nahhas Appx.029; ECF 82-5 at 30).

Indeed, at the April 12, 2023 hearing before Magistrate Judge Fuentes, counsel for the 777 Defendants stated that his clients had represented that they were working "to respond to the 16 interrogatories, 18 document requests and 9 requests for admission previously served on Tactical and the 16 interrogatories, 15 document requests and 7 requests for admission previously served on 777, and [] will provide responses to those requests as soon as we are able..."[6] (ECF 82-5 at 30).

The 777 Defendants' motion to compel arbitration (ECF 62) was filed

---

[6] The 777 Defendants had already responded to Plaintiff's first and second sets of discovery requests.

alongside a companion motion to stay discovery (ECF 64), which was denied, and with prejudice. Magistrate Judge Fuentes made clear, however, that the 777 Defendants could bring another motion to stay: "If anybody needs to...renew a motion to stay or bring another one, there's no prejudice as to that, but the motion to stay at least today is denied with prejudice..." (Al-Nahhas Appx.25). Incredibly, they filed no subsequent motion to stay discovery. Still further, the 777 Defendants did not ever ask the District Court to stay the case. While discovery and settlement were referred to Magistrate Judge Fuentes, every other case management deadline was set – and reset – each time at the parties' request, by the District Court. (ECF 20).

The 777 Defendants' litigation conduct is wholly inconsistent with an intent to arbitrate. *See Smith v. Adams & Assocs.*, 14cv5522, 2015 U.S. Dist. LEXIS 138670, at *12-13 (N.D. Ill. Oct. 9, 2015) (finding waiver where the defendant acquiesced to the setting of a discovery cut-off date and waited eleven months from suit filing to file a motion to compel arbitration).

### C.    Plaintiff Suffered Prejudice.

While prejudice is not necessary for a finding of waiver, it is relevant to the waiver analysis, and Plaintiff suffered it. *Morgan*, 142 S. Ct. at 1711.

During the fourteen-month delay, the District Court found that the 777 Defendants "led Al-Nahhas on a fruitless discovery chase," (SA012) "drag[ged] out discovery," (*id.*) and "drove [Al-Nahhas] to expend resources to file a motion to compel [production]" (SA009) and then dropped a "bombshell" (filing the motion

to compel arbitration) only after agreeing to respond to additional discovery (SA013).

By the time the 777 Defendants moved to compel arbitration, Plaintiff had issued eleven third party subpoenas resulting in the production of tens of thousands of documents at great expense. (ECF 84 at 7; ECF 84-5 at 17). The parties have litigated third party discovery matters in five venues: the District of South Dakota, the District of Oregon, the Eastern District of Missouri, the District of Nevada, and the Northern District of Illinois (before Judge Cummings).

On April 12, 2023, shortly before denying the 777 Defendants' motion to stay discovery, Magistrate Judge Fuentes remarked:

> And so forgive me, but it kind of -- it kind of smacks a little bit of delay. It smacks a little bit of gamesmanship...and so it's concerning to me. So why should I grant this stay now? What took you so long? And how do we address the fact that they've incurred some expenses? They've had to file two motions now to get this stuff, and you never told them until... more than a year after filing of the case... (Al-Nahhas Appx.8).

The District Court found that "[t]he 777 Defendants knew of the arbitration provision from the time Al-Nahhas filed the complaint...Yet, they sat on their hands and led Al-Nahhas to believe that they intended to proceed with discovery." (SA013). The District Court's finding of waiver was not erroneous.

## IV.    WHETHER NON-SIGNATORIES CAN ENFORCE AN ARBITRATION AGREEMENT IS A QUESTION FOR THE COURTS

The issue of whether the 777 Defendants have any right as non-signatories to compel Plaintiff to arbitrate is for the courts. Although the arbitration agreement has a delegation provision (DA035) courts treat the question of

whether an entity is a third-party beneficiary as one of contract formation, which is (notwithstanding a delegation clause) to be decided by a court. *See O'Connor v. Ford Motor Co.*, 19cv5045, 2023 U.S. Dist. LEXIS 3340, at *21 (N.D. Ill. Jan. 9, 2023) (*citing K.F.C. v. Snap Inc.*, 29 F.4th 835, 837 (7th Cir. 2022) ("[e]ven the most sweeping delegation cannot send the contract-formation issue to the arbitrator, because until the court rules that a contract exists, there is simply no agreement to arbitrate. . . . [T]he breadth of delegation is irrelevant if the parties did not enter into a contract") and *CCC Intelligent Solutions Inc. v. Tractable Inc.*, 36 F.4th 721, 723 (7th Cir. 2022)).

In addition, as discussed at Point VII, *infra*, the delegation provision is unenforceable, and Plaintiff specifically challenged its validity. (ECF 82 at 21 ("Plaintiff specifically challenges the delegation clause"); ("enforcing the delegation provision would place an arbitrator in the impossible position of deciding the enforceability of the agreement without authority to apply any applicable federal or state law.") (internal citation omitted). The District Court was correct to decide arbitrability. *Gingras*, 922 F.3d at 126.

## V. THE DISTRICT COURT CORRECTLY APPLIED ILLINOIS LAW TO DETERMINE THAT THE 777 DEFENDANTS CANNOT ENFORCE THE ARBITRATION AGREEMENT AS NON-SIGNATORIES

The question as to whether a non-signatory may enforce an arbitration agreement is a question of state law. *Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021). *See also Scheurer v. Fromm Family Foods L.L.C.*, 863 F.3d 748, 752 (7th Cir. 2017) ("'A litigant who was not a party to the relevant arbitration

agreement may invoke § 3 if the relevant state contract law allows him to enforce the agreement[.]'" (*quoting Arthur Andersen L.L.P. v. Carlisle*, 556 U.S. 624, 630 (2009)); *Warciak v. Subway Rests., Inc.*, 880 F.3d 870, 871 (7th Cir. 2018) (applying Illinois law).

Federal courts exercising supplemental jurisdiction over state law claims use the forum state's choice-of-law rules to determine applicable state substantive law. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684-85 (7th Cir. 2014) (*citing Felder v. Casey*, 487 U.S. 131, 151 (1988)). *See also Balt. Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 681 (7th Cir. 1986) ("We agree that the choice-of-law rule for pendent state claims should be that of the forum.").

In deciding to apply Illinois law, the District Court properly looked to Illinois choice of law rules. *McCoy*, 760 at 684-85. Under Illinois choice-of-law rules, Illinois law applies unless an actual conflict with another state's law is shown or the parties agree that Illinois law does not apply. *Id.* (*citing Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 2014 IL 116389, ¶ 9, 10 N.E.3d 902, 905 and *Belleville Toyota v. Toyota Motor Sales, U.S.A.*, 199 Ill. 2d 325, 351, 770 N.E.2d 177, 194 (2002)). The 777 Defendants failed to establish either of those two things.

## A.    The 777 Defendants Have Waived the Choice-of-Law Issue.

The 777 Defendants have waived the choice-of-law issue. *Momient-El v. DeTella*, 118 F.3d 535, 540 (7th Cir. 1997). A choice-of-law issue may be waived

if a party fails to assert it. *McCoy*, 760 F.3d at 684-85. So, then, when no party raises a choice-of-law issue "the federal court may simply apply the forum state's substantive law." *Id.* (*citing Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009)).

The 777 Defendants made no argument below that the law of any jurisdiction other than Illinois should apply. Indeed, they cited exclusively cases from Illinois courts. Now, for the first time, they argue that the law of the Rosebud Sioux Tribe should have been applied. In addition, and for the first time, they contend that there is some tribal contract law, but admit that it says nothing about third-party enforcement of contracts. (777 Br. 22). The 777 Defendants argue that because there is no tribal law concerning third-party contract enforcement, the District Court should have used federal law "to fill the gap." (*Id.*). Because none of these issues or factual questions were raised below, they have been waived.

### B. If This Court Finds that the Choice-of-Law Issue was Not Waived, the District Court Should be Affirmed Because the 777 Defendants Failed to Establish an Actual Conflict Necessitating a Choice-of-Law Determination.

As stated above, under Illinois choice-of-law rules, Illinois law applies unless an actual conflict with another state's law is shown. The 777 Defendants did not articulate a difference between Illinois law and any other law, "much less an outcome determinative one." *Sosa*, 8 F.4th at 637. In fact, the 777 Defendants concede that there is *no* tribal law concerning third-party contract enforcement. (777 Br. 22). If there's no tribal law regarding third-party contract enforcement, then there necessarily cannot be a conflict between tribal law and that of Illinois

26

which possibly could have necessitated a choice-of-law determination in the first place.

The 777 Defendants argue that they urged the District Court to apply the "federal common law standard articulated in *Paragon Micro, Inc. v. Bundy*, 22 F. Supp. 3d 880 (N.D. Ill. 2014) ..." (777 Br. 22). They did no such thing below. In any case, *Paragon* is of no help. Applying *Arthur Andersen*, 556 U.S. at 630-31, this Court "subsequently held that equitable estoppel must be analyzed under state contract law." *Hanc & Brubaker Holdings v. Nxt LVL Servs., L.L.C.*, 22cv1526, 2023 U.S. Dist. LEXIS 14410 at *13 (N.D. Ill. Jan. 27, 2023) (*citing Sosa*, 8 F.4th at 642). Indeed, "the Illinois Supreme Court has reaffirmed its longstanding detrimental reliance standard in equitable estoppel claims." *Sosa*, 8 F.4th at 637, 642 (*citing In re Scarlett Z.-D.*, 2015 IL 117904, ¶ 25, 28 N.E.3d 776, 785).

Because the 777 Defendants failed to demonstrate a conflict between Illinois law and any other law, a choice-of-law determination was inappropriate, and the District Court was correct to apply Illinois law. *Sosa*, 8 F.4th at 638; *Gonzalez v. Volvo of Am. Corp.*, 752 F.2d 295, 299 (7th Cir. 1985).

### C.    The 777 Defendants Cannot Enforce a Choice-of-Law Clause in a Contract to Which They Are Not Parties.

The 777 Defendants point to the choice-of-law clause in ZocaLoans' loan agreement but it is undisputed that the 777 Defendants are not signatories to the contract. And as this Court has noted, "generally, choice-of-law clauses in contracts do not apply to non-parties." *A.D.*, 885 F.3d at 1063 n.14. *See also*

*Thornton v. M7 Aero. LP*, 903 F. Supp. 2d 654, 663 (N.D. Ill. 2012) (St. Eve, J.) ("[T]hird parties cannot take advantage of the choice of law provisions in contracts they did not sign."); *Henson v. U.S. Dist. of N. Cal.* (*In re Henson*), 869 F.3d 1052, 1059 (9th Cir. 2017) ("A choice-of-law clause … is a contractual right and generally may not be invoked by one who is not a party to the contract in which it appears.").

Indeed, Illinois courts consistently refuse to allow non-signatories to invoke contractual choice-of-law clauses. *See, e.g.*, *Water Applications & Sys. Corp. v. Bituminous Cas. Corp.*, 2013 IL App (1st) 120983, ¶ 49, 986 N.E.2d 124, 137 ("[A] third party may not take advantage of a choice of law provision that it did not sign."); *Maremont Corp. v. Cheshire*, 288 Ill. App. 3d 721, 726-27, 681 N.E.2d 548, 551-52 (1st Dist. 1997) (same); *Maldonado v. Creative Woodworking Concepts, Inc.*, 342 Ill. App. 3d 1028, 1032, 796 N.E.2d 662, 665 (3d Dist. 2003) ("[A] choice of law or forum clause in a contract is not applicable to a non-party. We therefore will resolve this matter by reference to Illinois law.") (internal citation omitted).

This rule makes sense. Applying the contract's tribal choice-of-law provision would "assume the answer to the antecedent question of contract formation at issue. . . ." *Nucap Indus., Inc. v. Robert Bosch L.L.C.*, 273 F. Supp. 3d 986, 1006 (N.D. Ill. 2017). *See also Kaufman v. Am. Express Travel Related Servs. Co.*, 07cv1707, 2008 U.S. Dist. LEXIS 18129, at *10 (N.D. Ill. Mar. 7, 2008) ("[A]s an antecedent matter, the court must determine whether the parties have

a valid contract, and, before it can do that, it must decide which state's law applies to the issue of contract formation.").[7]

The 777 Defendants cannot enforce the tribal choice-of-law provision as they are not parties to the contract.

### D.    Illinois Law Cannot be Waived and Tribal Law Does Not Apply.

The 777 Defendants argue that no state law whatsoever should be applied to resolve a choice-of-law issue which requires the application of state law. The suggestion is fatuous. Illinois law cannot be waived (*see* Point IX., *infra*) and there is no basis to apply tribal law to off-reservation conduct between non-Native Americans. *Jackson v. Payday Fin., L.L.C.*, 764 F.3d 765, 786 (7th Cir. 2014).

Native American tribes do not have legislative or judicial jurisdiction with respect to tortious or criminal acts committed by nonmembers against other nonmembers off the reservation. *Jackson*, 764 F.3d at 783; *Montana v. United States*, 450 U.S. 544, 566 (1981). Furthermore, such jurisdiction cannot be conferred by consent. *Jackson*, 764 F.3d at 783 ("a nonmember's consent to tribal authority is not sufficient to establish the jurisdiction of a tribal court," and the legislative jurisdiction of a tribe is coextensive with its adjudicatory

---

[7] Other circuit courts agree. *See, e.g.*, *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012) ("Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established."); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (discussing whether a choice-of-law clause can select which law applies to determine whether the contract containing it is enforceable as a "circular inquiry"); *B-S Steel of Kan. v. Tex. Indus.*, 439 F.3d 653, 661 n.9 (10th Cir. 2006) (noting "the logical flaw" inherent in applying a contractual choice-of-law provision before determining whether the contract is enforceable).

jurisdiction); *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 115 (2d Cir. 2014).

Here, ZocaLoans is run by non-Native Americans out of Miami, Florida - nearly two-thousand miles from the lands of the Rosebud Sioux Tribe. (ECF 111 at 2).

The 777 Defendants waived the choice-of-law issue by not raising it below. Even if they did not, they failed to demonstrate a conflict between Illinois law and the law of any other jurisdiction, let alone an outcome-determinative one, thus rendering a choice-of-law determination inappropriate. In addition, Illinois law cannot be waived and there is no basis to apply tribal law. The District Court correctly applied Illinois law.

## VI.  THE 777 DEFENDANTS ARE NOT ENTITLED TO ENFORCE THE ARBITRATION AGREEMENT AS NONPARTIES UNDER ANY THEORY

The 777 Defendants cannot enforce the arbitration agreement as nonparties under any theory. Under Illinois law, "[a] nonsignatory to a contract typically has no right to invoke an arbitration provision contained in that contract." *Sosa v. Onfido, Inc.*, 8 F.4th 631, 639 (7th Cir. 2021). Recognized exceptions are "third-party beneficiary, agency, and equitable estoppel." *Id.* None of these apply here.

### A.  The 777 Defendants are Not Third-Party Beneficiaries of the Contract.

The 777 Defendants deny that they are "agents" or "affiliated entities" of ZocaLoans and otherwise fail to identify any status entitling them to enforce the

agreement as nonparties. Accordingly, they cannot enforce the contract.

State law governs whether an agreement to arbitrate exists, and who is entitled to enforce that agreement. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62-64 and n. 9 (1995) (interpreting arbitration clause according to New York and Illinois law); *Sosa*, 8 F.4th at 637 ("A nonparty's right to enforce an arbitration agreement is governed by state law.").

Under Illinois law, there is a "strong presumption against" conferring contractual benefits on noncontracting third parties. *Sosa*, 8 F.4th at 639. Indeed, in *Sosa*, this Court held that:

> To overcome that presumption, the implication that the contract applies to third parties must be so strong as to be practically an express declaration . . . the language of the contract must show that the contract was made for the direct, not merely incidental, benefit of the third person. *Sosa*, 8 F.4th at 639 (internal citations and quotations omitted).

This intention "must be shown by an express provision in the contract identifying the third-party beneficiary by name or by description of a class to which the third party belongs." *Id.* (*quoting Martis v. Grinnell Mut. Reinsurance Co.*, 388 Ill. App. 3d 1017, 905 N.E.2d 920, 924 (3rd Dist. 2009).

The purported third party bears the burden of showing that the parties to the contract intended to confer a direct benefit on the third party. *F.H. Paschen/S.N. Nielsen, Inc. v. Burnham Station, L.L.C.*, 372 Ill. App. 3d 89, 96, 865 N.E.2d 228, 235 (1st Dist. 2007).

The 777 Defendants have not overcome the strong presumption against

conferring contractual rights on noncontracting parties. First, Plaintiff's contracts with ZocaLoans do not mention 777 Partners or Tactical. (DA031; SA016). In addition, the 777 Defendants have failed to identify any class to which they belong. They deny that they are "agents" or "affiliated entities" of ZocaLoans, and generally "dispute Plaintiff's allegations" concerning their involvement in ZocaLoans. (ECF 97 at 10). In answering Plaintiff's complaint, they also deny that they are associated with ZocaLoans, that they direct ZocaLoans' activity, or that they participated in the affairs of ZocaLoans. (ECF 16 at 5). In their Opening Brief, the 777 Defendants concede that they do not have any contracts with ZocaLoans (777 Br. 4). In short, they deny having any relationship with ZocaLoans whatsoever. The District Court did not err in taking them at their word and finding just that.

Under Illinois law, there is a strong presumption against creating contractual rights in third parties. *Sosa*, 8 F.4th at 639. To overcome this presumption, "the implication that the contract applies to third parties must be so strong as to be practically an express declaration." *155 Harbor Drive Condo. Ass'n v. Harbor Point Inc.*, 209 Ill. App. 3d 631, 568 N.E.2d 365, 375 (1st Dist. 1991) (quotation omitted). No such showing was made here, and the District Court was thus correct in holding that the 777 Defendants cannot enforce the ZocaLoans arbitration clause as third-party beneficiaries.

### B. The 777 Defendants Concede That They Are Not Agents of ZocaLoans.

The District Court was also correct in finding that the 777 Defendants

failed to establish an agency relationship. "The test of agency is whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." *Chemtool, Inc. v. Lubrication Techs.*, 148 F.3d 742, 745 (7th Cir. 1998) (*quoting Anderson v. Boy Scouts of Am., Inc.*, 226 Ill. App. 3d 440, 589 N.E.2d 892, 894 (1992)). Courts require "evidence" to support assertions of authority and control. *Sosa*, 8 F.4th at 641.

The 777 Defendants offer nothing. *See Sphere Drake Ins. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 672 (7th Cir. 2004) ("[T]he party alleging an agency relationship … bears the burden of proving its existence by a preponderance of the evidence."). Rather, "the 777 Defendants maintain their independence from ZocaLoans and renounce any agency relationship." (SA017; ECF 97 at 10). As a result, the District Court reasoned, "they must accept the accompanying concession that they have no legal authority to enforce the arbitration provisions based on agency." (SA019). *See Ervin v. Nokia, Inc.*, 349 Ill. App. 3d 508, 513, 812 N.E.2d 534, 539 (5th Dist. 2004) (rejecting defendant's claim of agency, particularly when the nonsignatory "steadfastly denie[d]" any relationship to the signatory).

The District Court was correct in finding that the 777 Defendants cannot enforce the arbitration agreement as agents of ZocaLoans while disclaiming the existence of an agency relationship.

### C.      Equitable Estoppel Does Not Apply.

Finally, the District Court was correct in holding that the 777 Defendants cannot enforce the ZocaLoans arbitration agreement under a theory of equitable estoppel. (SA019). As this Court has explained, "[i]n Illinois, '[a] claim of equitable estoppel exists where a person, by his or her statements or conduct, induces a second person to rely, to his or her detriment, on the statements or conduct of the first person.'" *Warciak v. Subway Rests., Inc.*, 880 F.3d 870, 872 (7th Cir. 2018) (*quoting Ervin*, 812 N.E.2d at 541). Detrimental reliance is to be shown "by clear, concise, and unequivocal evidence." *Ervin*, 812 N.E.2d at 541 (internal quotations omitted).

The District Court found that because "[t]he 777 Defendants do not identify any of Al-Nahhas's statements or conduct that induced their detrimental reliance" their equitable estoppel theory fails. (SA019). Indeed, the 777 Defendants do not contend that Plaintiff made any statement at all, let alone that they relied on any statement to their detriment.

The District Court's finding of no detrimental reliance – and thus, no basis for equitable estoppel – was not an abuse of discretion. *See Scheurer*, 863 F.3d at 752 n.2 ("We typically review the application of [equitable estoppel] for abuse of discretion, and nothing about arbitration would seem to call for a different approach.").

## VII.   THE DELEGATION PROVISION IS UNENFORCEABLE

While parties may delegate gateway questions of arbitrability, a party may

contest the enforceability of a delegation clause with the same arguments it employs to contest the enforceability of the overall arbitration agreement. *Hengle v. Treppa*, 19 F.4th 324, 336 (4th Cir. 2021) *cert. dismissed sub nom. Asner v. Hengle*, 212 L. Ed. 2d 795, 142 S. Ct. 2093 (2022) (*citing Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286, 291-292 (4th Cir. 2020)); *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 226-27 (3d Cir. 2018).

"[I]f a party challenges the validity under [9 U.S.C.] § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4." *Gingras,* 922 F.3d at 126 (*quoting Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010)). Indeed, it is axiomatic that "[a] federal court  has a duty to determine whether a contract violates federal law before enforcing it." *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83 (1982).

Below, Plaintiff specifically challenged the enforceability of the delegation provision because it disclaimed state contract law and because it's a prospective waiver of his right to vindicate federal and state statutory rights and remedies. The issue of arbitrability is thus for the courts.

### A.    The Validity of an Arbitration Agreement Depends on State Law.

The Supreme Court has made clear that an arbitration clause depends on state law for its validity and that the only effect of the FAA is to prohibit states from discriminating against arbitration. *Morgan*, 142 S. Ct. at 1711. *See also Arthur Andersen,* 556 U.S. at 631 (state law is applicable to determine  which

35

contracts are binding under FAA § 2 and enforceable under § 3 if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally).

The validity and enforceability of any arbitration clause must be determined "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The "grounds as exist" to determine contract formation, validity and contract defenses are creatures of state law. "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally. . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc.*, 514 U.S. at 944.

Accordingly, state contract law must be applied to determine the enforceability of an arbitration clause. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 343 (2011) (effect of FAA § 2 is to preserve generally applicable state law contract defenses).

## B. An Arbitration Agreement that Disclaims State and Federal Law is Unenforceable.

The arbitration agreement the 777 Defendants seek to enforce disclaims state and federal law in favor of the law of a tribe that lacks legislative and adjudicative authority to regulate the transaction. The loan agreement's "Governing Law" provision states that tribal law shall exclusively apply to a dispute:

> LAW THAT APPLIES. The laws of the Rosebud Sioux Tribe ("Tribal Law") will govern this Agreement, without regard to the laws of any state or other jurisdiction, including the conflict of laws rules of any state. You agree to

be bound by Tribal Law, and in the event of a bona fide dispute between you and us, Tribal Law shall exclusively apply to such dispute. (ECF 1-2 at 4).

The arbitration provision provides that, "[t]he arbitrator shall apply the laws of the Rosebud Sioux Tribe that govern this Agreement. Any arbitration award may be enforced in the courts of the Rosebud Sioux Tribe, or by our governmental regulator." *Id.* at 6. The only reasonable way to interpret the contract is that tribal law applies to the exclusion of federal and state law. *See Smith v. W. Sky Fin., LLC*, 168 F. Supp. 3d 778, 785 (E.D. Pa. 2016) (categorically refusing to enforce tribal-arbitration clause in case alleging federal and state-law claims).

The arbitration agreement takes the forbidden step of expressly disclaiming state law. The waiver of state law deprives the arbitrator from applying the body of law necessary to determine arbitrability. The Fourth Circuit held that a ban on state law in a tribal loan contract rendered both the arbitration clause and the delegation clause unenforceable. *Hengle*, 19 F.4th at 339.

Numerous federal courts have reached similar conclusions. *See, e.g., Gibbs v. Stinson*, 421 F. Supp. 3d 267, 291 (E.D. Va. 2019) *aff'd sub nom. Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286 (4th Cir. 2020) ("Defendants' approach would require an arbitrator to determine whether a valid and enforceable arbitration agreement exists absent the federal or state law tools necessary to do so."); *MacDonald v. Cash Call, Inc.*, 16cv2781, 2017 U.S.Dist. LEXIS 64761, 2017 WL 1536427, at *4 (D.N.J. Apr. 28, 2017), *aff'd,* 883 F.3d 220

(3d Cir. 2018) ("[I]f the question of the enforceability of the arbitration clause were sent to an arbitrator, he or she would be categorically prohibited from applying any federal or state law to arrive at an answer."); *Smith*, 168 F. Supp. 3d at 786 ("In practical terms, enforcing the delegation provision would place an arbitrator in the impossible position of deciding the enforceability of the agreement *without* authority to apply any applicable federal or state law") (emphasis in original); *Ryan v. Delbert Servs. Corp.*, 5:15cv05044, 2016 U.S.Dist. LEXIS 121246, 2016 WL 4702352, at *5 (E.D. Pa. Sept. 8, 2016) ("The wholesale waiver of federal and state law thus dooms both the delegation provision and the arbitration clause…").

The delegation clause is unenforceable – and Plaintiff specifically challenged it below – as it "requires an arbitrator to determine whether a valid and enforceable arbitration agreement exists" without access to federal or state laws "necessary to make that determination." *Hengle*, 19 F.4th at 339.

## VIII. THE ARBITRATION AGREEMENT IS UNENFORCEABLE AS IT PROSPECTIVELY WAIVES PLAINTIFF'S FEDERAL AND STATE STATUTORY RIGHTS AND REMEDIES

Assuming, *arguendo*, that the District Court erred in finding waiver (it did not, *see infra* Point III.), and even if the 777 Defendants are entitled to enforce the contract as nonparties under applicable Illinois law (they are not, *see infra* Point VI.), this Court should affirm because the arbitration agreement is unenforceable because it operates as a prospective waiver of state and federal statutory rights and remedies and because it is unconscionable.[8]

---

[8] This Court may affirm "on any ground supported in the record, so long as that ground was adequately addressed in the district court and the nonmoving party had

An arbitration clause that operates as a prospective waiver of either federal or state statutory rights is invalid. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 637 n.19 (1985) (federal statutory rights); *Viking River Cruises, Inc. v. Moriana*, 142 S.Ct. 1906, 1919 and n.5, 213 L.Ed.2d 179 (2022) (state statutory rights); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 334 (4th Cir. 2017) ("a court first must examine whether, as a matter of law, the 'choice-of-forum and choice-of-law clauses operate in tandem as a prospective waiver of a party's right to pursue statutory remedies.'") (internal citation omitted). This is because –

> [A]n arbitration agreement is a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute. An arbitration agreement thus does not alter or abridge substantive rights; it merely changes how those rights will be processed. And so we have said that "'[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral . . . forum.

*Viking River Cruises*, 142 S. Ct. at 1919.

The arbitration agreement the 777 Defendants seek to enforce waives Plaintiff's statutory rights and remedies under state and federal law. While the FAA has broad reach, "courts will not enforce a prospective waiver" of statutory rights in *any* contract. *American Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 241 (2013).

In *Viking River Cruises,* 142 S. Ct. at 1919 n.5, the Supreme Court rejected the notion that the prospective waiver doctrine is limited to a provision

---

an opportunity to contest the issue." *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 432 (7th Cir. 2005).

waiving substantive rights under federal law. The Supreme Court noted that there "is not anything unique about federal statutes" for the application of the prospective waiver doctrine. *Id.* "That is why," the Court added, it had previously considered the application of the doctrine in a case concerning "claims arising under state law." *Id.* (*citing Preston v. Ferrer*, 552 U.S. 346, 359 (2008) (enforcing an arbitration agreement because it did not relinquish substantive rights under California law)).

An arbitration agreement is unenforceable, pursuant to the "prospective waiver" doctrine, if it "prospective[ly] waived" a "party's right to pursue statutory remedies." *Mitsubishi Motors*, 473 U.S. at 637 n. 19; *Am. Express Co.*, 570 U.S. at 235 (noting that the prospective waiver/ effective vindication exception "serves to harmonize competing federal policies" by allowing courts to invalidate arbitration agreements that "operate as a waiver of a party's right to pursue statutory remedies.").

The Second, Third, and Fourth Circuits, as well as the overwhelming majority of federal district courts, have refused to enforce "arbitration agreements that limit a party's substantive claims to those under tribal law, and hence forbid federal claims from being brought." *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 237 (3d Cir. 2020). *See, e.g., Hengle*, 19 F.4th at 343; *Gibbs v. Haynes*, 967 F.3d 332, 339-45 (4thh Cir. 2020) (Agee, Gregory, Motz, JJ. (unanimous)); *Sequoia*, 966 F.3d at 292-94 (unanimous); *Dillon v. BMO Harris Bank*, 856 F.3d 330 at 333-37 (Keenan, Duncan, Thacker, JJ. (unanimous));

*Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 673-76 (4th Cir. 2016) (Wilkinson, Keenan, Harris, JJ., (unanimous)); *Gingras*, 922 F.3d at 126-128 (2d Cir. 2019) (Hall, Leval, Chin, JJ. (unanimous)); *Harris v. FSST Mgmt. Servs., LLC*, 22cv01063, 2023 U.S. Dist. LEXIS 138601 (N.D. Ill. Aug. 9, 2023); *Fitzgerald v. Wildcat*, 3:20cv00044, 2023 U.S. Dist. LEXIS 145245, at *25 (W.D. Va. Aug. 18, 2023); *Smith v. Western Sky Fin., LLC*, 168 F. Supp. 3d 778 (E.D. Pa. 2016); *Hengle*, 433 F. Supp. 3d 825 (E.D. Va. 2020); *Titus v. ZestFinance, Inc.*,18cv 5373 2018 WL 5084844, at *5 (W.D. Wash. Oct. 18, 2018), *vacated on other grounds by Titus v. BlueChip Fin.*, 786 F. App'x 694 (9th Cir. 2019); *Ryan v. Delbert Servs. Corp.*, 5:15 cv 05044, 2016 U.S.Dist. LEXIS 121246, 2016 WL 4702352, at *4 (E.D. Pa. Sept. 8, 2016); *Rideout v. CashCall, Inc.*, 2:16cv3817, 2018 U.S. Dist. LEXIS 37908, 2018 WL 1220565, *6 (D.Nev. March 7, 2018).

Here, Plaintiff cannot vindicate his statutory rights and remedies under the PLPA, the Illinois Interest Act, the Illinois Consumer Fraud Act, or RICO because the arbitration agreement disclaims all state and federal law. Plaintiff's RICO claim (Count IV) is brought under the "unlawful debt" provision of 18 U.S.C. § 1962(c). Plaintiff alleges that:

> All loans made in the name of Rosebud Lending LZO d/b/a ZocaLoans to Illinois residents are (a) unenforceable under Illinois law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Illinois law, where (c) the usurious rate is at least twice the enforceable rate (9%)….The loans are therefore "unlawful debts" as defined in 18 U.S.C. §1961(6). (ECF 1 at 14).

State law is the *sine qua non* of a RICO "unlawful debt" claim under 18 U.S.C. §

41

1962(c). Because the underlying agreement disclaims all state and federal law, the agreement operates as a prospective waiver of Plaintiff's state and federal statutory rights.

### A. An Arbitration Agreement that Waives Statutory Rights is Unenforceable.

The underlying agreement states that tribal law applies to the exclusion of state and federal law. The 777 Defendants claim that the arbitration agreement does not waive state statutory rights "because none exist[]." (777 Br. 34). With respect to federal claims, they argue that tribal law incorporates federal law such that Plaintiff can vindicate his federal statutory claims. Both arguments are meritless. Because the agreement provides that only tribal law applies in arbitration, "federal law does not. As a result, the arbitration agreement effects as an impermissible prospective waiver of statutory rights." *Williams*, 965 F.3d at 240.

It does not matter that the arbitration agreement purports to require that federal claims be sent to arbitration because the same agreement prevents effective vindication of those very federal statutory claims. As the Fourth Circuit noted in *Hengle*, 19 F.4th at 343, "such language highlights the arbitration provision's impermissible tactic of compelling arbitration of federal claims only to then nullify those claims by precluding application of federal law." *See also Hayes*, 811 F.3d at 673-674 ("With one hand, the arbitration agreement offers an alternative dispute resolution procedure in which aggrieved persons may bring their claims, and with the other, it proceeds to take those very claims away.").

42

Indeed, "[r]eading the arbitration provision as encompassing disputes it does not empower the arbitrator to resolve is far from fanciful. As another example, the provision requires that all class claims be sent to arbitration but, a few paragraphs later, explicitly forbids class arbitration." *Hengle*, 19 F.4th at 343. So too here.

The Second and Third Circuits have invalidated arbitration agreements in tribal lending contracts for similar reasons. *See Gingras*, 922 F.3d at 117; *MacDonald*, 883 F.3d at 227; *Williams*, 965 F.3d at 244.

### B. Federal and State Rights Cannot be Vindicated Under Tribal Law.

In the course of discovery, ZocaLoans produced a document called the "Consumer Financial Services Regulation" (the "Regulation") (ECF 82-6, Exhibit F). The Regulation says *nothing* about a consumer's ability to vindicate her federal and state statutory rights, but does state that "[n]o federal law not applicable to Federally recognized Indian tribes and no state law whatsoever...shall apply to extensions of credit under a Loan operated in accordance with this section." (*Id.* at 19). The Regulation also states that "[t]he Tribal dispute resolution process authorized under this Regulation is considered by the Tribe to constitute a petition for redress submitted to a sovereign government, without waiver of sovereign immunity or exclusive jurisdiction, and does not create any binding procedural or substantive rights for a complainant against the Tribe." (*Id.* at 18).

Section 8 of the Regulation, titled "Resolving Borrower Disputes[,]" provides that "[t]o the extent the Authority determines the basis of complainant's

complaint sought for reconsideration is not wholly without merit, the Authority shall then direct the Licensee to participate in binding arbitration…with the complainant…" (*Id.*).

The Regulation does not provide a private right of action. Remedies purportedly available under the Regulation may only be pursued against a Licensee, and *only with* the approval of the Authority. Even if the Authority authorizes an arbitration, a "complainant" cannot obtain relief against anyone other than a "Licensee." This constitutes an impermissible waiver rendering the arbitration and delegation provisions unenforceable. *Gibbs*, 966 F.3d at 338-40 ("As the borrowers correctly point out, the relevant tribal codes would not permit them to effectively vindicate the federal protections and remedies they seek—that is, the borrowers could not assert a RICO claim seeking treble damages against the entities and individuals who comprise the Haynes Defendants.").

In addition, RICO is noticeably absent from the list of statutes to which a lender is supposedly subject. In considering a similar provision, the Fourth Circuit concluded that a "claimant proceeding under tribal law would be unable to assert a RICO claim against individuals associated with a tribal lender and certainly could not pursue RICO's treble damages remedy." *Hengle*, 19 F.4th at 343. *See also Gingras*, 922 F.3d at 127 (invalidating tribal lending arbitration clause which "purports to offer neutral dispute resolution but appears to disallow claims brought under federal and state law").

As in *Hengle*, *Gingras*, and *Gibbs*, the Regulation "precludes consumers

44

from vindicating their federal statutory rights by replacing the remedial and deterrent remedies selected by Congress with the Tribe's own remedial scheme—the exact concern that gave rise to the prospective waiver doctrine." *Hengle v. Asner*, 433 F. Supp. 3d 825, 859 (E.D. Va. 2020).

The agreement is unenforceable, and this Court should so hold.

## IX. THE ARBITRATION AGREEMENT IS UNENFORCEABLE AS IT IS UNCONSCIONABLE AND VIOLATIVE OF ILLINOIS PUBLIC POLICY

Under Illinois law, a contractual provision may be unconscionable on either procedural or substantive grounds, or a combination of both. *Jackson v. Payday Fin.*, 764 F.3d 765, 777 (7th Cir. 2014) (*citing Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 622 (2006)).

### A.    The Arbitration Agreement is Substantively Unconscionable.

The arbitration agreement is substantively unconscionable under Illinois law because it disclaims all rights under state law. *Harris*, 2023 U.S. Dist. LEXIS 138601, at *19 (finding tribal arbitration agreement substantively unconscionable and thus unenforceable because it waived the protections of the Predatory Loan Prevention Act).

Illinois enacted the Predatory Loan Prevention Act (the "PLPA") in 2021 to (1) outlaw usurious loans like those made in the name of ZocaLoans; (2) prohibit any and all devices for making such loans; and (3) prevent Illinois consumers from agreeing to such loans or waiving their rights.

"[P]arties are free within bounds to use a choice of law clause in an

arbitration agreement to select which local law will govern the arbitration," the Fourth Circuit explained in *Hayes*, "[b]ut a party may not underhandedly convert a choice of law clause into a choice of no law clause—it may not flatly and categorically renounce the authority of the federal statutes to which it is and must remain subject." *Hayes*, 811 F.3d at 675. This is precisely what the underlying contract does when it applies tribal law to the exclusion of all state and federal law.

> ### i. The Illinois Predatory Loan Prevention Act Applies to a Predatory 693.10% Loan Made by an Unlicensed, Out-of-State Lender to an Illinois Consumer Over the Internet.

In determining the enforceability of the arbitration provision, a court should determine whether a statute of the forum state – here, Illinois – expressly addresses the choice-of-law issue. Under the *Restatement 2d, Conflict of Laws*, § 6(1), "A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." Comment b to § 6 makes clear that such a directive includes a statute which provides that it applies to transactions with a specified geographic nexus to the enacting state:

> b. Intended range of application of statute. A court will rarely find that a question of choice of law is explicitly covered by statute. That is to say, a court will rarely be directed by statute to apply the local law of one state, rather than the local law of another state, in the decision of a particular issue. On the other hand, the court will constantly be faced with the question whether the issue before it falls within the intended range of application of a particular statute. The court should give a local statute the range of application intended by the legislature when these intentions can be ascertained and can constitutionally be given effect. ***If the legislature intended that the statute should be applied to the out-of-state facts involved, the court should so***

*apply it unless constitutional considerations forbid.* On the other hand, if the legislature intended that the statute should be applied only to acts taking place within the state, the statute should not be given a wider range of application. *Sometimes a statute's intended range of application will be apparent on its face, as when it expressly applies to all citizens of a state including those who are living abroad.* When the statute is silent as to its range of application, the intentions of the legislature on the subject can sometimes be ascertained by a process of interpretation and construction. Provided that it is constitutional to do so, the court will apply a local statute in the manner intended by the legislature even when the local law of another state would be applicable under usual choice-of-law principles. (Emphasis added).

Illinois follows § 6. *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 159,

879 N.E.2d 893, 900 (2007).

The PLPA specifies the geographic facts that require its application. Section

15-1-15, 815 ILCS 123/15-1-15, entitled "Applicability," provides:

(a)     Except as otherwise provided in this Section, this Act applies to any person or entity that *offers or makes a loan to a consumer in Illinois.*

(b)     The provisions of this Act apply to any person or entity that seeks to evade its applicability by any device, subterfuge, or pretense whatsoever. . .(Emphasis added)

Thus, the Illinois General Assembly has specified that offering or making a "loan"

to a "consumer" in Illinois makes the PLPA applicable. 815 ILCS 123/15-1-10

contains definitions. "Consumer" is defined to mean "any natural person." "Loan"

is defined to include "closed end and open-end credit, retail installment sales

contracts, motor vehicle retail installment sales contracts, and *any transaction*

*conducted via any medium whatsoever, including, but not limited to,*

*paper, facsimile, Internet, or telephone*." (Emphasis added). Furthermore,

815 ILCS 123/15-5-15, "No evasion," provides that:

> (a) No person or entity may engage in any device, subterfuge, or pretense to evade the requirements of this Act, including, . . . making, offering, assisting, or arranging a debtor to obtain a loan with a greater rate or interest, consideration, or charge than is permitted by this Act **through any method including mail, telephone, internet, or any electronic means regardless of whether the person or entity has a physical location in the State**." (Emphasis added).

Thus, an out-of-state lender that makes a loan to a natural person in Illinois via the Internet or other remote means, but has no physical location in Illinois, is expressly covered. The PLPA could not be clearer.

The Illinois General Assembly expressly stated that the purpose of the PLPA is to protect Illinois consumers from predatory loans, 815 ILCS 123/15-1-5, and that the PLPA "shall be construed as a consumer protection law for all purposes... and shall be liberally construed to effectuate its purpose." *Id.* To stamp out predatory loans, the PLPA imposes a 36% rate cap – grossly exceeded by the loans in this case. 815 ILCS 123/15-5-5 ("Notwithstanding any other provision of law, for loans made or renewed on and after the effective date of this Act, a lender shall not contract for or receive charges exceeding a 36% annual percentage rate on the unpaid balance of the amount financed for a loan..."). The PLPA declares that "[a]ny loan made in violation of this Act is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

### ii.    The Predatory Loan Prevention Act Expressly Prevents Consumers from Giving Up Their Rights Under the Act.

Count III of Plaintiff's complaint seeks relief under the PLPA and the Illinois Consumer Fraud Act. (ECF 1 at 2). The PLPA *expressly* negates the ability of consumers to waive its protections. 815 ILCS 123/15-10-25. The provision titled "No waivers," states that "[t]here shall be no waiver of any provision of this Act." *Id*. In addition, 815 ILCS 123/15-10-5 provides that, "(b) Any violation of this Act, including the commission of an act prohibited under Article 5, constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act." The Consumer Fraud Act also prohibits waiver: "[a]ny waiver or modification of the rights, provisions, or remedies of this Act shall be void and unenforceable." 815 ILCS 505/10c. The PLPA cannot be avoided by contract.

As a general proposition, even without reference to the PLPA, a choice-of-law clause by which a protected party agrees that a transaction subject to a statute will be governed by the law of a less protective state constitutes a waiver of statutory rights. For example, in *Wright-Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 132 (7th Cir. 1990), an Indiana franchise statute made it unlawful to require a franchisee "to prospectively assent to a release or waiver which purports to relieve any person from liability to be imposed by this chapter" or to "enter into an agreement limiting litigation brought for breach of the agreement in any manner whatsoever." (cleaned up). This Court held that this barred a choice-of-law provision specifying the law of a less protective state:

49

The public policy, articulated in the nonwaiver provisions of the statute is clear: a franchisor, through its superior bargaining power, should not be permitted to force the franchisee to waive the legislatively provided protections, whether directly through waiver provisions or indirectly through choice of law. This public policy is sufficient to render the choice to opt out of Indiana's franchise law one that cannot be made by agreement. (*Id.*)

The same result was reached under the Illinois franchise statute. *Korean Am. Broad. Co. v. Korean Broad. Sys.*, 09cv6665, 2012 U.S. Dist. LEXIS 44353, at *6-8, (N.D. Ill. Mar. 29, 2012).

This principle is codified in the PLPA. A choice-of-law clause by which an Illinois consumer purports to agree that a loan which is covered by and violates the PLPA shall be governed by the law of a less protective jurisdiction is on its face:

(1)     a prohibited "waiver," 815 ILCS 123/15-10-25,

(2)     a prohibited "waiver or modification of the rights, provisions or remedies of this Act," 815 ILCS 505/10c, and

(3)     a prohibited "device, subterfuge, or pretense to evade the requirements of this Act, including, . . . making, offering, assisting, or arranging a debtor to obtain a loan with a greater rate or interest, consideration, or charge than is permitted by this Act through any method including mail, telephone, internet, or any electronic means regardless of whether the person or entity has a physical location in the State." 815 ILCS 123/15-5-15(a).

If a non-Illinois lender that conducts business over the Internet could immunize itself from the PLPA by simply inserting a choice-of-law clause specifying the law of some jurisdiction that does not protect consumers, the PLPA would be a dead letter.

Even without an express statutory prohibition of waiver, Illinois courts

have held that contractual choice-of-law and forum selection clauses cannot be enforced if the contract containing it was invalid or the clause contravened Illinois' fundamental public policy. *Maher & Assocs., Inc. v. Quality Cabinets,* 267 Ill. App. 3d 69, 640 N.E.2d 1000 (2d Dist. 1994). "As a preliminary matter, we reject the defendants' suggestion that we apply Virginia law in determining the validity of the parties' contract [pursuant to a contract clause]. One cannot rely on foreign law to enforce a contract that is illegal in the forum, and Illinois has the stronger interest in the outcome of the controversy." *First Nat'l Bank v. Malpractice Research*, 179 Ill. 2d 353, 358-59, 688 N.E.2d 1179, 1182 (1997). The fact that the PLPA declares violative contracts void shows that the statute expresses the fundamental public policy of Illinois. *Maher*, 267 Ill. App.3d at 76. A statutory prohibition of waiver also shows that it expresses the fundamental public policy of Illinois. *Rico Indus. v. TLC Grp., Inc.*, 2018 IL App (1st) 172279, ¶ 66, 123 N.E.3d 567, 588.

The PLPA clearly states a fundamental public policy of Illinois when it specifies what contracts it applies to, declares contracts for interest in excess of 36% void, and goes to elaborate lengths to outlaw any waiver or evasion of its provisions. A waiver of the PLPA is unconscionable.

### iii.    The Illinois Interest Act and Consumer Fraud Act Also Apply.

The PLPA also requires compliance with other Illinois laws regulating the loans it regulates. 815 ILCS 123/15-5-5 ("Nothing in this Act shall be construed to permit a person or entity to contract for or receive a charge exceeding that

permitted by the Interest Act or other law.").

The Interest Act also expressly addresses the permissible rate where a lender in another state contracts with an Illinois borrower. 815 ILCS 205/8 provides:

> Sec. 8. When any written contract, wherever payable, shall be made in this State, or between citizens or corporations of this State, ***or a citizen or a corporation of this State and a citizen or corporation of any other State, territory or country*** (or shall be secured by mortgage or trust deed on lands in this State), ***such contract may bear any rate of interest allowed by law to be taken or contracted for by persons or corporations in this State, or allowed by law on any contract for money due or owing in this State.*** (Emphasis added)

The Interest Act expressly provides that a loan made by an out of state lender to an Illinois consumer is subject to Illinois law. It does not require that the lender have any physical presence in Illinois. *Jackson v. Payday Fin., LLC*, 79 F. Supp. 3d 779, 786 (N.D. Ill. 2015).

### B.     The Underlying Agreement is Unenforceable as it is Violative of Public Policy.

The PLPA addresses the subject of the transactions to which it applies. It expressly applies to the underlying transactions with Plaintiff. In short, there is no basis for disregarding controlling Illinois law.

Loans made by an unlicensed lender to an Illinois resident at more than 9% violate the Interest Act (815 ILCS 205/4) and are subject to statutory damages under 815 ILCS 205/6. A contract by an unlicensed lender to make a consumer loan at an interest rate exceeding 20% is a felony. 720 ILCS 5/17-59 (formerly 720 ILCS 5/39-1 *et seq.*). Here, one of Plaintiff's loans had an interest rate of

693.10%. (ECF 1-2 at 11; DA031). Illinois courts will not aid a litigant who seeks to enforce an illegal contract. *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill. 2d 366, 380, 837 N.E.2d 48, 56 (2005). Both the claimed arbitration agreement and delegation provision are contrary to public policy and unconscionable.

## X.    CONCLUSION

The District Court did not err in finding that to the extent the 777 Defendants had any right to compel Plaintiff to arbitrate his claims, such right had been waived given their fourteen-month delay in raising arbitration and because of their litigation conduct. In addition, the District Court correctly held that the 777 Defendants are not entitled to enforce the arbitration agreement as nonparties under applicable Illinois law. The District Court should be affirmed on those bases. This Court should also affirm on grounds that the arbitration agreement is unenforceable because it operates as a prospective waiver of state and federal statutory rights and remedies and because it is unconscionable.

Respectfully submitted,

*/s/ Matthew J. Goldstein*
Matthew J. Goldstein

Daniel A. Edelman (ARDC 0712094)
Tara L. Goodwin (ARDC 6207473)
Julie Clark (ARDC 6273353)
Matthew J. Goldstein (ARDC 6339033)
**EDELMAN, COMBS, LATTURNER**
        **& GOODWIN, LLC**
20 South Clark Street, Suite 1500

Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:  courtecl@edcombs.com

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Circuit Rule 32(c) because it contains 13,592 words, excluding the parts of the document excluded by Fed. R. App. P. 32(f). This document complies with the typeface requirements of Circuit Rule 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 Business in 12-point Bookman Old Style font.


*/s/ Matthew J. Goldstein*
Matthew J. Goldstein


Dated: December 11, 2023

## <u>CERTIFICATE OF SERVICE</u>

I, Matthew J. Goldstein, certify that on Monday, December 11, 2023, a true and accurate copy of the foregoing document was filed via the Court's CM/ECF system, and notification of such filing was sent to all counsel of record.

<u>/s/ Matthew J. Goldstein</u>
Matthew J. Goldstein

## SUPPLEMENTAL APPENDIX

Transcript of April 12, 2023 Hearing before Magistrate
Judge Fuentes..................................................................Al-Nahhas Appx.001

1    <u>TRANSCRIBED FROM DIGITAL RECORDING</u>

2               IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
3                      EASTERN DIVISION

4   EIDO HUSSAM AL-NAHHAS,              )
    on behalf of Plaintiff and the     )
5   class members described below,     )
    also known as                      )   Case No. 22-cv-00750
6   Mohammad Al-Nahhas,                 )
                                        )   Chicago, Illinois
7                   Plaintiff,          )   April 12, 2023
    -vs-                                )   9:02 a.m.
8                                       )
    ROSEBUD LENDING LZO,                )
9   doing business as                   )
    ZocaLoans; 777 PARTNERS LLC;        )
10  and TACTICAL MARKETING              )
    PARTNERS, LLC,                      )
11                                      )
                    Defendants.         )
12
                    TRANSCRIPT OF PROCEEDINGS
13   BEFORE THE HONORABLE GABRIEL A. FUENTES, MAGISTRATE JUDGE

14  APPEARANCES:

15  For the Plaintiff:     MR. DANIEL A. EDELMAN
                           MR. MATTHEW J. GOLDSTEIN
16                         Edelman, Combs, Latturner & Goodwin, LLC
                           20 S. Clark Street, Suite 1500
17                         Chicago, IL 60603
                           (312)739-4200
18                         courtecl@edcombs.com
                           Mgoldstein@edcombs.com
19
         **PLEASE NOTIFY OF INCORRECT SPEAKER IDENTIFICATION**
20          NOTE:  FAILURE TO STAND NEAR THE MICROPHONE MAKES
               PORTIONS UNINTELLIGIBLE AND INAUDIBLE
21
    Transcriber:
22
               KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
23                    Official Court Reporter
                  United States District Court
24         219 South Dearborn Street, Suite 1426
                   Chicago, Illinois  60604
25            Telephone:  (312) 435-5569
             Kathleen_Fennell@ilnd.uscourts.gov

1   APPEARANCES:   (Continued)

2   For the Defendant
    Rosebud:                    MS. AMY L. STARINIERI GILBERT
3                               McGuireWoods LLP
                                77 W. Wacker Drive, Suite 4100
4                               Chicago, IL 6061
                                (630) 881-8065
5                               agilbert@mcguirewoods.com

6   For Defendants 777
    And Tactical:               MR. PATRICK DAUGHERTY
7   (Telephonically)            Van Ness Feldman LLP
                                3717 Mt. Diablo Blvd., Suite 200
8                               Lafayette, CA 94549
                                (202) 298-1810
9                               pod@vnf.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings heard in open court:)
2         MR. GOLDSTEIN:  Good morning, your Honor.  Matthew
3    Goldstein for plaintiff.
4         MR. EDELMAN:  And Daniel Edelman for plaintiff.
5         THE COURT:  Very good.
6         Defense?
7         MS. GILBERT:  Good morning, your Honor.  This is Amy
8    Gilbert from McGuireWoods on behalf of Rosebud Lending.
9         THE COURT:  Okay.  Hold on a second.
10        All right.  You said Ms. Goodman, right?
11        MS. GILBERT:  Gilbert.
12        THE COURT:  Okay, close.  Not really.
13        Okay.  Anybody else?
14        Is anybody on the phone today?
15        MR. DAUGHERTY:  Yes, your Honor.  This is Patrick
16   Daugherty from Van Ness Feldman appearing on behalf of 777
17   Partners and Tactical Marketing.
18        THE COURT:  Okay.  Very good.
19        I'm just making some notes.  Hang on.
20        It sounds like all of our parties are represented
21   here today, but is there somebody else who's not here?
22        If there is, Ms. Gilbert --
23        MR. DAUGHERTY:  Your Honor --
24        THE COURT:  Go ahead, Mr. Daugherty.
25        MR. DAUGHERTY:  I apologize, your Honor.

1          Mr. Clair was planning to attend in person and

2   represent -- is my co-counsel who represents the same two

3   parties that I do.

4          THE COURT:  Okay.  But I thought I saw your name as

5   the filer of the motions that came through yesterday,

6   Mr. Daugherty, is that true?

7          MR. DAUGHERTY:  That is correct, your Honor.  Yes.

8          THE COURT:  All right.  And I'm going to trust that

9   you can argue these motions, and we're going to keep moving.

10   Limited time as always as the Court has.

11          So let's go through these.  First of all, there's the

12   motion to compel arbitration first filed by Rosebud and then a

13   subsequent motion was filed yesterday by 777 Partners and

14   Tactical, and along with that there are motions to stay,

15   initial one by Rosebud and then a later one yesterday by 777

16   Partners and Tactical.

17          So just to kind of get a preliminary question out of

18   the way, Mr. Daugherty, are the motions to compel arbitration

19   or I should say motion filed by your client and the motion to

20   stay the discovery in the wake of that compel arbitration

21   motion, Mr. Daugherty, are they basically identical to the one

22   that Rosebud filed first of all?

23          MR. DAUGHERTY:  With respect to the motion to stay,

24   your Honor, I would agree that, yes, they are identical.

25   There are perhaps two discrete issues in the substance of the

5

1   motion to compel arbitration that we addressed in our short

2   pleading, but we -- it is the same arbitration provision, so

3   they are largely identical.

4           THE COURT:  Okay.  That's good to know just because

5   from the Court's perspective, I don't know should I put these

6   two motions side by side and figure out what is being said in

7   one of them and not the other?

8           It wouldn't be unusual in this circumstance for 777

9   and Tactical to simply state that they were joining the

10  Rosebud motion.  It might have been more efficient and legally

11  less costly, but all that's up to you.

12          So with that out of the way, let me just -- let me

13  just ask Ms. Gilbert on the motion to stay, so when I get

14  motions to stay discovery, there's a case I like a lot that I

15  commonly follow.  It's *New England Carpenters Health and*

16  *Welfare Fund v. Abbott Labs*.  It's 2013 Westlaw 690613.  It's

17  Judge Rowland.

18          And basically that case talks about how motions to

19  dismiss, and that was a motion-to-dismiss case as the basis

20  for the motion to stay, that, you know, there's not an

21  assumption in the rules that discovery should be stayed

22  pending a Rule 12 motion, even a strong one.  We don't know if

23  the Rule 12 motion is going to be granted or denied.  The fact

24  that it could be granted, the fact that it might even be a

25  strong motion not really normally a basis to grant a stay.

6

1   Rather, Judge Rowland talks about is it a threshold-type
2   motion?

3           So does it raise perhaps something akin to qualified
4   immunity that would make the issue in the pending underlying
5   motion of a threshold nature that might warrant the cost
6   saving associated with a stay.

7           So I read your motion and I read the 777 and Tactical
8   motions to stay, again identical, but Ms. Gilbert, I guess on
9   reading them, my initial reaction was that a motion to compel
10  arbitration ordinarily -- I'm getting there; I'm sorry for the
11  long run-up.  It's a good question that I had for you, so bear
12  with me -- the motion to compel arbitration struck me as that
13  type of threshold motion because, like qualified immunity, the
14  ability to resort to an arbitration provision is one that is
15  intended to save a party having to go through things like
16  discovery in litigation.  And so I guess to vindicate that
17  interest in the parties' agreement, if there was one, and I
18  make no judgment as to whether there was or wasn't.  Judge
19  Tharp has the motion to compel arbitration under advisement.
20  But it's a similar -- it's a threshold-type motion.

21          But that said, I, as the magistrate judge, have a lot
22  of discretion to manage discovery.  *Jones v. City of Elkhart,*
23  737 F.3d 1107, 2013, Seventh Circuit.  So I do, and the
24  question that I have for you is I was a little puzzled by the
25  fact that here you have this need to compel arbitration, your

7

1  client.  You have this need to, you know, hold off on having
2  to do all this discovery, and yet this case was filed in
3  February of 2022, so you didn't know about the arbitration
4  clause then?  I doubt it.

5       And so what happened in the meantime?  Well,
6  discovery got started.  Nobody told the courts to stop it, to
7  slow it down.  There was -- there was a motion to compel on
8  March 3rd that the plaintiffs filed -- plaintiff.

9       They had to undertake expense of filing that motion,
10  right, after they had undertaken the expense of posing
11  discovery requests in writing, deciding that the requests were
12  overdue.  Apparently they were.

13       The Court had to have a hearing.  The plaintiff had
14  to incur the expense of having counsel attend that hearing and
15  argue it, and we wound up -- actually, let's see, we wound up
16  not having the hearing, as I see from my notes.  So there
17  wasn't the expense of a hearing, but there was the expense of
18  certainly gearing up for one, and then finding out that there
19  was an agreement to render the answers on March 27.

20       So, Ms. Gilbert, this is still part of the question.

21       You know, nobody said then, oh, by the way, you're
22  not going to get your discovery answers.  We're moving to stay
23  discovery entirely.  They thought they were going to get their
24  discovery answers.  They didn't.

25       They then filed or they wound up filing now a motion

1  to compel because, you know, well into discovery and well
2  after you had promised them these responses, you decided to
3  file this motion to compel an arbitration and now I don't want
4  to do discovery.

5        And so forgive me, but it kind of -- it kind of
6  smacks a little bit of delay.  It smacks a little bit of
7  gamesmanship, something of a sexist word, but I think you know
8  what I'm saying, and so it's concerning to me.

9        So why should I grant this stay now?  What took you
10  so long?  And how do we address the fact that they've incurred
11  some expenses?  They've had to file two motions now to get
12  this stuff, and you never told them until -- I guess it was
13  you filed this motion on April 7th, more than a year after
14  filing of the case, but you want to stay everything.

15        Tell me.

16        MS. GILBERT:  Thank you, Judge.  I will try to
17  address each of your points, but I think as a preliminary
18  matter, the motion to compel -- motion to compel discovery
19  responses was directed at the other co-defendants and not at
20  Rosebud Lending.

21        Rosebud -- we were retained, Sarah Zielinski and
22  myself at McGuireWoods were retained to represent Rosebud in
23  late February, early March.  We filed our appearances on
24  March 3rd.  It's my understanding from the client that they
25  were largely -- they were unrepresented for that time.

1  THE COURT:  Okay.

2  MS. GILBERT:  I understand that counsel -- that prior

3  counsel withdrew its representation formally.  I think that

4  motion was granted in late November, but it's my understanding

5  from the client that for months before that, that counsel had

6  other -- from my client's perspective, had pretty much

7  disappeared, so they were unrepresented.

8  THE COURT:  So that's helpful.  That's helpful.  It

9  was something I hadn't apprehended from the file, but I'm

10  still concerned because I still pretty much have to hold

11  parties to the same standard and if they weren't properly

12  represented or weren't represented, well, you know, maybe they

13  needed to be.

14  It's still late in the process now to be staying

15  discovery.  So there's no discovery requests pending on

16  Rosebud at all right now?

17  MS. GILBERT:  Well, I can explain.

18  So when we were represented, I immediately reached

19  out to Mr. Goldstein, plaintiff's counsel, let him know that

20  Rosebud was finally represented.  I asked about the status of

21  discovery and settlement.  Mr. Goldstein graciously told me

22  what had transpired with respect to both.

23  Our client also had not received copies of the

24  discovery that I presume was sent to prior counsel.  So I

25  asked for a copy of those written discovery requests, which

1   Mr. Goldstein again graciously gave a copy to me.  At that

2   point, he had also, Mr. Goldstein had also agreed to an

3   extension for our discovery responses to April 3rd.

4          And then in the interim, Mr. Goldstein and I have

5   been discussing settlement between plaintiff and Rosebud

6   specifically.  And, again, Mr. Goldstein agreed to an

7   extension of our discovery, Rosebud's discovery responses,

8   until April 27th.

9          THE COURT:  Okay.  Very helpful.  Without putting too

10  much on the record -- when it comes to settlement, we don't

11  like to do that -- but are settlement discussions serious?

12  Can you tell me yes or no?

13         MS. GILBERT:  I can tell you from Rosebud's

14  perspective, settlement is a very real option and it's

15  something that they want to pursue.

16         I made a counteroffer as recently as earlier this

17  week, I believe.  Mr. Goldstein can correct me if I'm wrong.

18         THE COURT:  Okay.

19         MS. GILBERT:  And we're just waiting to hear back.

20         THE COURT:  Okay.  Don't need too much detail.

21         Mr. Goldstein, you concur that the settlement

22  discussions with Rosebud are at least at a serious level, is

23  that something you're willing to tell me?

24         MR. GOLDSTEIN:  Your Honor, I think they were

25  serious.  I think the parties are pretty far apart.

1          THE COURT:  Well, that's always the case when you get

2   into a settlement discussion, but you've agreed to allow them

3   until April 27th to render these discovery responses, have

4   you?

5          MR. GOLDSTEIN:  Yes, your Honor, which is one day

6   before plaintiff's response in opposition to defendants'

7   motion to compel arbitration is due.

8          THE COURT:  Okay.

9          All right.  I think I've heard enough from Rosebud,

10  and I think I understand the landscape much better as to

11  Rosebud.

12         But Mr. Daugherty, what say you in response to the

13  same long, long question I put to Ms. Gilbert?  What took you

14  so long?  It sounds like you might not have as good a reason

15  as she did because they just entered into the case, didn't

16  really have the requests until very recently.

17         What about you and your client, Mr. Daugherty?  Tell

18  me if you would, please.

19         MR. DAUGHERTY:  Your Honor, we have a similar

20  background up until November of last year, so prior counsel

21  entered and represented the 777 defendants, including 777 and

22  Tactical in that term, and prior counsel received discovery

23  requests from plaintiff and I believe they were served in

24  October, but they were never provided to the client --

25         THE COURT:  Really?

1    MR. DAUGHERTY:  -- and the client was not made aware
2  of that.

3           THE COURT:  That's terrible.

4           MR. DAUGHERTY:  And so after prior counsel had
5  withdrawn, and I will say the same thing that Ms. Gilbert did,
6  which is that Mr. Goldstein provided those responses -- or
7  those requests to me, I don't have the exact date, but my
8  recollection is it was right around Thanksgiving of last year.

9           THE COURT:  Okay.

10          MR. DAUGHERTY:  So we have had them a little longer
11  than Ms. Gilbert and her client have had them.  So that is
12  what I think I can say about where the 777 defendants are.

13          THE COURT:  Okay.  I want to hear from Mr. Goldstein
14  in a minute, but Mr. Daugherty, I'm just sort of kind of
15  thinking aloud, okay, not saying that this might be what
16  happened, but I'm wondering how you and your clients would
17  feel about having this stay motion entered and continued for
18  now, so no ruling on it, but having you agree to provide the
19  discovery answers that have been asked for now at least since
20  March 3rd, the initial motion, have you provide those by
21  April 27 the way Rosebud is doing.

22          Is what is good for the Rosebud goose okay with the
23  777 and Tactical gander?

24          MR. DAUGHERTY:  Yes, your Honor.

25          I have more I could say about the discovery, but I'll

1  answer your question directly and just say yes, we would be
2  willing to agree to the 27th.

3         THE COURT:  Okay.  So hold on a second because I
4  don't want you to feel like you were not heard.  Just my
5  background is sometimes when I was a lawyer, I had judges who
6  didn't want me to make my record, and I vowed to never be that
7  way.

8         So you'll get to tell me more.  But I'll tell you,
9  Mr. Goldstein and Mr. Edelman, I'm really kind of leaning -- I
10 haven't heard from you yet -- I'm really kind of leaning
11 toward entering and continuing this stay motion through at
12 least April 27 or a few days after, give the parties a chance
13 to file a joint status report on was this discovery provided,
14 and that would also give the plaintiff a chance, who we
15 haven't heard at all on the stay motion yet, to tell me if you
16 feel any differently about it then than you might now, or
17 maybe you'll tell me you're okay with a stay motion today,
18 although I kind of doubt it.

19        But tell me, what would you think if they get
20 ordered -- everybody gets ordered to respond on the 27th what
21 they agreed to do, we enter and continue pending a status
22 report that you would file like the following week, but
23 there's no ruling today on the stay motion.  How would you
24 feel about that?  And what else do you want to tell me at all
25 about the stay motion?

1          MR. GOLDSTEIN:   Thank you, your Honor.

2          I think that would be agreeable to plaintiff, and

3   we'd like -- this case, as your Honor recognized, was filed in

4   February of 2022.  The discovery we issued to Rosebud Lending

5   and to 777 Partners and Tactical was served on October 5th and

6   October 10th.  We've been waiting a long time for this.

7          THE COURT:   Yeah, it's 30 days, so what happened?

8   Did somebody say I can't give it to you in 30 days, will you

9   agree to give me another month or two months?  Did that

10  happen?

11         MR. GOLDSTEIN:   No --

12         THE COURT:   Or did you not hear from them at all?

13         MR. GOLDSTEIN:   We didn't hear from prior counsel at

14  all, having served them, and as Ms. Gilbert said when she came

15  in, she requested an extra 30 days so they could get

16  acquainted.

17         As for the 777 Partners, they just never responded to

18  plaintiff's discovery requests.

19         THE COURT:   Because they were apparently never even

20  provided with the requests.

21         I don't want to dump on prior counsel, but my

22  reaction to that is the same.  I kind of have to hold those

23  parties responsible for what prior counsel did.

24         I can't imagine Mr. Daugherty or Ms. Gilbert, you

25  know, not providing discovery requests to clients and not

1    responding at all within the 30 days and, you know, playing

2    this game of not calling you back.  I can't imagine that they

3    would ever do that.

4         But it does appear that that's what their clients

5    did, at least to their agents, until pretty recently it sounds

6    like, right?

7         MR. GOLDSTEIN:  Yes, your Honor.  We don't know.

8    We've had great difficulty with 777 Partners and Tactical for

9    many months.  They responded to our second written discovery

10   requests, but, again, not at all to the first ones.

11        As your Honor knows, the district court and your

12   Honor has imposed various deadlines in this case.  We've

13   done -- we've obtained substantial discovery, and we've

14   learned that the underlying lending operation here is run by

15   non-tribal persons out of Miami, Florida, that the lion's

16   share of the profits from this enterprise flows to these Miami

17   defendants in the ballpark of around $400 million and that the

18   tribe receives a nominal sum.

19        And Rosebud Lending indicates that they plan to file

20   some type of dispositive motion as to sovereign immunity

21   should their motion to compel arbitration be denied.  Well,

22   any motion like that would raise factual issues for which we

23   need discovery.

24        So I guess I say that all to say, your Honor, that we

25   certainly would like responses to -- we'd like responses from

1  defendants before having to respond in opposition to the
2  motion to compel arbitration.

3  THE COURT:  Okay.  Well, the schedule of responding
4  on the motion to compel arbitration, that is something you
5  would have to address with Judge Tharp, but it sounds -- tell
6  me if I'm wrong -- sounds like plaintiff's position is going
7  to be even if we get the responses to this round of written
8  discovery, why would we agree then to a stay at this point, or
9  tell me if I'm wrong about that?

10  MR. GOLDSTEIN:  That's exactly right, your Honor.

11  THE COURT:  Okay.  You're pretty severely opposed to
12  any stay at this point in the litigation, right?

13  MR. GOLDSTEIN:  Absolutely, Judge.

14  THE COURT:  And not to put words in your mouth,
15  although that's what I'm doing, part of it is because you just
16  didn't get responses for such a long time, including this
17  timeframe before current counsel stepped in.

18  MR. GOLDSTEIN:  Yes, Judge.

19  THE COURT:  Okay.

20  MR. GOLDSTEIN:  And if I may, your Honor, the first
21  time arbitration was raised to me was in March of this year.
22  It was never, as far as I know, raised in any filing to the
23  Court, so really a bomb has been dropped in this case, where I
24  have nine third-party subpoenas that I've issued, four are
25  outstanding.  There's a lot of discovery underway.

1    THE COURT:  Okay.  Well, you know, some bombs drop
2  and they explode, some are duds, and it will be up to Judge
3  Tharp to figure that one out.

4    Mr. Goldstein or Mr. Edelman, was there anything else
5  you wanted to address today?  Because I don't want to cut you
6  off, but then I want to hear more from defense counsel.

7    MR. EDELMAN:  One of the things -- one of the grounds
8  on which we intend to oppose the Rosebud motion to compel
9  arbitration -- sorry.

10    One of the grounds on which we want to oppose the
11  Rosebud motion to compel arbitration is that the entire
12  agreement, including the arbitration provision, is a sham
13  designed to avoid application of Illinois law to a dispute,
14  which is essentially between a local resident and these two
15  companies in Miami, and that the interposition of tribal
16  persons is simply an immaterial device designed to permit this
17  kind of delaying argument to be made.  We have the same
18  arguments with respect to 777 and Tactical.

19    In addition, those two entities are not entitled to
20  invoke any arbitration clause even if it were otherwise
21  enforceable.  It does not expressly state that these two can
22  enforce it, and under recent Illinois and Seventh Circuit law,
23  you need to be an express intended third-party beneficiary of
24  an arbitration clause in order to raise it.  They're not.
25    THE COURT:  Sounds like you're going to have a --

1  well, let me get the right word -- an interesting briefing and
2  argument there on that motion in front of Judge Tharp, but,
3  again, none of that is really before me today.

4          It's still a threshold motion.  That's the hard part
5  for me.  That's what makes this a closer call for me.  It
6  really is a threshold motion.  I understand it's vigorously
7  opposed.

8          But did you have anything else, Mr. Edelman or
9  Mr. Goldstein, on the motion to stay, which is the one before
10  me today?

11          MR. GOLDSTEIN:  Nothing -- nothing else from
12  plaintiff.  Thank you.

13          THE COURT:  Okay.  Let me turn to Ms. Gilbert for a
14  minute because I know you wanted to say something, and I kind
15  of cut you off and didn't mean to.

16          I will often interrupt, and I apologize in advance
17  for that, and I just tell people, hey, I was trained to be
18  ready for judges to interrupt.  And that's not quite the same
19  thing as so rudely interrupting a person, it's just what
20  courts do.  I didn't interrupt you before intentionally, but
21  what did you want to add?

22          MS. GILBERT:  I have three points, your Honor.

23          One main consideration when a court is determining
24  whether to grant a motion to compel arbitration is whether the
25  motion is timely, and a key factor in whether the motion is

1   timely is how substantially or how substantively the parties
2   have engaged in discovery.

3          If your Honor goes forward with ordering the parties
4   to respond to written discovery by April 27th, I suppose I
5   would ask that the order reflect that doing so does not in any
6   way impede or impair Rosebud's ability to move to compel
7   arbitration.   What I'm worried about is risking waiver here --
8          THE COURT:   Yeah.

9          MS. GILBERT:   -- by engaging in substantive
10  discovery.

11         THE COURT:   I don't see it as a waiver.   I think -- I
12  don't see it as a waiver.   I think your statement just now
13  makes that clear.

14         I suppose there's risk that the district court could
15  look at it and say you went farther down the slippery slope
16  and, from an equitable perspective, might cause him to be more
17  concerned about granting your motion to compel arbitration,
18  but I suspect he'll just decide that motion on its merits, you
19  know, was there an agreement or not; does it need to be
20  enforced or not.   All that is up to him.   So don't worry about
21  that, but I appreciate your making a record on that.

22         Anything else, Ms. Gilbert?   And then I'll hear from
23  Mr. Daugherty.

24         MS. GILBERT:   Yes.   Two other points.

25         One, I just want to note that any dispositive motion

1    on the sovereign immunity piece has not yet been filed.  We

2    are first pursuing the motion to compel arbitration, so

3    counsel's representation that there's a need for discovery on

4    the sovereign immunity piece I don't believe is ripe for

5    decision right now.

6        Currently, we're just litigating the motion to compel

7    arbitration.  I will also note that settlement is still very

8    much on the table, and we look forward to engaging in that

9    with Mr. Goldstein.

10       My last point, your Honor, would be that Rosebud has

11   been responsive, and I have been in frequent communication

12   with Mr. Goldstein and plaintiff's counsel, and we certainly

13   intend to continue to do so.

14       THE COURT:  Okay.  Let me give you a couple

15   reactions.

16       Even if you haven't filed a sovereign immunity

17   motion, I think it's fair to say that plaintiffs are on notice

18   that that is a potential defense in the case.  And what does

19   Rule 26(b)(1) tell us about discovery:  The scope is anything

20   that's relevant to a claim or a defense in the case.

21       So if they want discovery related to sovereign

22   immunity, I don't think 26(b)(1) tells them that they can't

23   have it.  I don't see it as disproportional.

24       I think the question really goes to the stay motion,

25   should they have anything at all at this point.

1          And then what was the second point you made?

2          MS. GILBERT:   I just wanted to make a record that

3    Rosebud has been responsive since we've been retained --

4          THE COURT:   Okay.

5          MS. GILBERT:   -- to represent Rosebud.

6          THE COURT:   Okay.

7          MS. GILBERT:   And we certainly intend to continue to

8    be responsive to counsel and their requests.

9          THE COURT:   Okay.  And I know the other thing I

10   wanted to say.

11         You mentioned settlement as a possibility here, and,

12   of course, the truth is that it's always a possibility in

13   cases.  And many judges, and I kind of adopted this approach,

14   where if the settlement talks result in a mediation, if they

15   result in something that does appear to really warrant slowing

16   the rest of the train down, then the Court can entertain the

17   idea of maybe suspending a discovery schedule while that

18   happens.

19         But my inclination is always you have to be in one

20   port or the other.  You can't really be in both.  You can't

21   really slow down a discovery portal with the idea that, well,

22   maybe we're going to settle; well, maybe we might do it, you

23   know, because if we did that, we would have, you know, a lot

24   of 2013 and 2014 cases not resolved.  So we like to avoid

25   that.

1       So I hear what you're saying, and you should
2  understand that, let's see, this is -- this referral includes
3  settlement, which means if at any time the parties all
4  agree -- we always have to be consensual on settlement -- if
5  you all agree that you want to do a settlement conference with
6  me, just reach out to Ms. Knight.  You have her number on the
7  website.  Let her know, and then we will set up a date for
8  everybody to come in telephonically so you don't have to
9  physically come in the courthouse.

10      We're doing physical hearings now on motions because
11  counsel has asked us to and because we can set up three or
12  four of them at the same time, and other counsel can kind of
13  hear how I think about things and maybe how I'm feeling that
14  day, or whatever it is, and it can be very helpful toward
15  resolving things.  I found it very helpful.  So that's why
16  you're here today.

17      But in a first settlement conference, it would just
18  be over the phone, and the parties don't -- shouldn't be
19  there, it's just counsel, and we really just confirm that you
20  really do want to do a mediation and we pick a date.  You get
21  a schedule.  You know, we try to get you in within 30 to
22  60 days.

23      So if you reach that point, you will want to let us
24  know that, let my staff know, and what very typically happens
25  is once we do that phone call and everybody confirms for me

1   that, yeah, I'm serious about wanting to do the mediation, we

2   usually -- as discovery supervisor, I will suspend those

3   requirements.  I will not want you spending money on discovery

4   if you're really serious about settling.

5          But we're not at that point yet.  So that gets me to

6   you, Mr. Daugherty.  I want to be sure you're heard.  There

7   was more you wanted to say.  And to help you a little bit,

8   I'll tell you even my thinking tends to evolve a little bit as

9   I go through here, and I'm also now thinking that per Rule 1,

10  Rule 1 says we have to promote the speedy and inexpensive

11  resolution of matters, and I really don't know about entering

12  and continuing this motion at this point.  I might be ready to

13  decide it.  I might be ready to decide it against you.

14         But go ahead, tell me anything else you want to tell

15  me because I haven't made up my mind yet.

16         MR. DAUGHERTY:  Thank you, your Honor.

17         Are you -- I have comments I would like to make on

18  the plaintiff's motion to compel discovery.  I don't think I

19  have anything further that I would like to present to the

20  Court on the stay motion.

21         THE COURT:  Okay.

22         MR. DAUGHERTY:  May I address the plaintiff's motion

23  or --

24         THE COURT:  That's helpful.  Hold on for a minute

25  because I think it may make sense to have the movant go first

1  on their motion to compel.

2         So let me -- well, first a prefatory question,

3  Mr. Daugherty.  You know, the other thing that happened to me

4  in my career as a prior lawyer was I would go around to

5  various jurisdictions, other counties in Illinois, other

6  states or districts around the country, and there was this

7  thing that would sometimes happen.  It was called being

8  home-towned, okay, and I will just tell you I hated that.  So

9  that was another thing I vowed I would never do.

10        So don't feel like you're being home-towned here, but

11 I need to ask you are you admitted, either pro hac or are you

12 admitted to our bar in any way?

13        MR. DAUGHERTY:  No, your Honor.  I -- I am not a

14 member of the Illinois bar, and I believe I entered my

15 appearance pro hac vice in this matter --

16        THE COURT:  Okay.

17        MR. DAUGHERTY:  -- again, around Thanksgiving.

18        THE COURT:  Okay.  So you were granted leave to

19 appear pro hac.

20        MR. DAUGHERTY:  I believe so, your Honor.

21        THE COURT:  Okay.  Then that's fine.  If for some

22 reason you haven't quite finished that process yet, if

23 there's -- not that I care about the fee, but if there's a fee

24 to be paid, if there's some further form to be filed to make

25 it happen, just make sure you do that, and if you have, don't

1  even worry about it.

2          So what else -- let me tell you what we're going to

3  do on the motion to stay.  I think I've heard enough to know

4  that I'm going to deny this motion in my discretion under

5  Rule 1, under the *Jones* case.  I really feel like the amount

6  of time that has been allowed to pass here through really I

7  think not the fault, at least entirely, of counsel who have

8  appeared today, but through the parties' actions in not

9  responding to discovery earlier and allowing this amount of

10  time to go by I think is enough for me at this point to say,

11  no, we're going to, in this instance even though it's a

12  threshold motion, we're going to go ahead and let this

13  continue.

14          I also have faith that Judge Tharp, who's a terrific

15  district judge, former marine officer, very, very chop-chop

16  kind of judge, I have faith that he'll move expeditiously on

17  your motion or at least hear it in due course, and due course

18  for him is not a super long time.

19          If anybody needs to -- if they think they need to

20  renew a motion to stay or bring another one, there's no

21  prejudice as to that, but the motion to stay at least today is

22  denied with prejudice, and that applies to all of the

23  defendants who filed a motion to stay.

24          So that's your ruling on the motion to stay.

25          Let me turn to Mr. Goldstein or Mr. Edelman.  What

1   are we doing on this motion to enforce?  Why should I grant

2   this?  What specifically are you looking to enforce?

3           MR. GOLDSTEIN:  Thank you, your Honor.

4           This motion, plaintiff's motion to enforce and for

5   sanctions is just as to Defendants 777 Partners and Tactical

6   Marketing Partners.

7           THE COURT:  Okay.

8           MR. GOLDSTEIN:  So we issued discovery to them on

9   October 5th and October 10th, 2022, and we didn't get any --

10  we've not received any response whatsoever, so on March 3rd of

11  this year, your Honor, I filed a motion to compel discovery

12  responses from those defendants.  Your Honor advised the

13  parties that if we reached an agreement as to date of service

14  of those responses, relayed the same to the Court, that the

15  motion hearing would be stricken.

16          Subsequently, 777 and Tactical agreed to provide full

17  and complete discovery responses to plaintiff's counsel by

18  March 27th of this year, and they did not, and they have

19  failed to do so.

20          THE COURT:  Let me cut you off.  I've expressed an

21  interest and I really didn't get big objection from anybody

22  here to having these discovery responses served on April 27th.

23  If that were to occur, would that be the relief that you've

24  effectively sought in your motion?

25          MR. GOLDSTEIN:  No, your Honor, because we also

1   ask --

2          THE COURT:   For sanctions.

3          MR. GOLDSTEIN:   -- for an award of attorneys' fees,

4   and we also asked your Honor to find that any -- any

5   objections to those requests, we ask your Honor to hold that

6   any objections to those requests have been waived because we

7   believe they have indeed been.

8          THE COURT:   Yeah, that's a good argument on a waiver

9   because you can't get held to the requests -- you can't wait

10  forever to respond and then expect to be able to litigate all

11  of that.

12         But I'll tell you how I feel about that.   Rule 1, it

13  includes promoting the just resolution of disputes, and to me

14  having to give up any objection at all to a broad set of

15  discovery requests because you -- you weren't diligent, you

16  didn't have counsel in place who was diligent, whatever it is,

17  but now you do and now we're going to get responses, I

18  don't -- it's not consistent with my, you know, view of

19  substantial justice to hold that there's a waiver.   So I'm

20  kind of disinclined to do that.

21         And then as to sanctions, you know, I'll tell you how

22  I feel about that.   I'm inclined to deny that without

23  prejudice.   So, you know, that might be something that we hear

24  about again, particularly if, for example, April 27th rolls

25  around and somehow you don't get your responses.   You know,

1   maybe there will be a ground for sanctions then.

2           There may be a ground for sanctions now.  As you

3   know, the rule says that the resistance has to be

4   substantially justified.  That's the language in the rule.

5           I think that's a little cloudy here because we have

6   parties that were not engaged in this litigation, and part of

7   that was the fault of earlier counsel apparently, not even

8   getting them the discovery responses.  So to punish them for

9   that, I'm having a problem doing that.

10          So I think you're getting a lot today.  The stay

11  motion is getting denied.  You're going to get your discovery

12  responses.  I think the plaintiff got a lot of relief today,

13  and I'm just not inclined to grant you sanctions, fees, or a

14  waiver, but react to that if you want to make any more record,

15  Mr. Goldstein.

16          MR. GOLDSTEIN:  That's fine.  Thank you, Judge.

17          THE COURT:  Okay.  That's in accord with another

18  great rule of practice:  When you've basically won, you really

19  don't have to say anything else.  It's a rule I like.

20          Mr. Daugherty, let me let you be heard on all this

21  because it's not final.  I haven't heard from you yet,

22  although you indicated you could produce on April 27, but tell

23  me, what else did you want to tell me about this?

24          MR. DAUGHERTY:  Thank you, your Honor.  And, yes,

25  I'll just start with April 27th would be an acceptable date

1     for the 777 defendants, and the one point I just want to make

2     to the Court and also to opposing counsel, the 777 defendants

3     have not and are not refusing to participate in the discovery

4     process.

5           I would just like to point out to the Court that

6     within the last 90 days, the 777 defendants have responded to

7     plaintiff's second set of discovery requests.  We've produced

8     contracts between the two co-defendants in that response.  We

9     provided timely objections to the third set of discovery

10     requests, and are willing -- we have not received a request to

11     meet and confer from plaintiff's counsel on those objections,

12     but we will do so with that.

13           We have provided the initial disclosures from the 777

14     defendants, which were overdue and had not been completed by

15     prior counsel.

16           We have worked with opposing counsel and co-defendant

17     counsel to agree to a confidentiality order in this

18     proceeding, and I bring those all up simply to point out to

19     the Court we have been engaged.  We have been -- we have

20     prioritized responding to the more recent discovery requests

21     in a timely fashion, and I acknowledge and understand that our

22     responses to the first set of discovery requests are overdue,

23     and I would greatly appreciate the Court permitting us until

24     April 27th to make those responses.

25           I will say when we shared our production of documents

1    on March 27th with the opposing counsel, the statement I made

2    to opposing counsel in that email was we continue to work with

3    our clients to respond to the 16 interrogatories, 18 document

4    requests and 9 requests for admission previously served on

5    Tactical and the 16 interrogatories, 15 document requests and

6    7 requests for admission previously served on 777, and we will

7    provide responses to those requests as soon as we are able.

8         That was the last communication I shared with

9    plaintiff's counsel about this first set of requests prior to

10   the motion being filed, and that remains true today.  We are

11   working on those overdue discovery requests that were

12   initially served on prior counsel, and we do intend to provide

13   responses as soon as we are able.

14        THE COURT:  Okay.  I really appreciate your candor,

15   and what you told me reinforces a little bit, makes me feel

16   more comfortable or further comfortable with denying the

17   sanctions request without prejudice and a finding that there's

18   not -- that there shouldn't be a waiver here.

19        Ms. Gilbert, did you have anything you wanted to add?

20        MS. GILBERT:  No, your Honor.

21        THE COURT:  Okay.

22        MS. GILBERT:  Well --

23        THE COURT:  The motion is not directed at you anyway.

24        MS. GILBERT:  It's not directed at me.

25        One point on the motion to stay, I would go back to

1   my concern about engaging in the discovery process.  It's not

2   just the written requests that plaintiffs have issued that we

3   will now be responding to by April 27th.  It's also these

4   third-party subpoenas that have been served.

5               THE COURT:  I'm sorry, third-party --

6               MS. GILBERT:  Third-party subpoenas that have been

7   served.

8               THE COURT:  Okay.

9               MS. GILBERT:  Six third-party subpoenas have been

10  served to various banks.  They are very broad.  They are

11  requesting all documents for all accounts related to our

12  client.

13              We have been doing our best to engage with counsel

14  for those parties as well.  But, again, our ability, as we see

15  the rule or as we see the case law, our ability to engage in

16  meeting and conferring on those subpoenas, filing a motion to

17  quash those subpoenas, which I do believe there are good

18  grounds to do so, is limited by our ability to engage in the

19  litigation process while our motion to compel arbitration is

20  pending --

21              THE COURT:  Yeah.

22              MS. GILBERT:  -- given the timeliness factor.

23              THE COURT:  That is another reason in favor of

24  granting the stay motion, but I decided not to do that because

25  I think the time for that kind of motion kind of came and

1    went, and I recognize you were not on board yet as counsel,

2    but my judgment on that one is that that's now a cost that

3    you're going to have to bear, and I would really encourage

4    everybody to engage meaningfully in the Local Rule 37.2

5    process.

6         Mr. Daugherty, Local Rule 37.2 is our local

7    equivalent to the meet-and-confer requirement in the federal

8    rules except it is different.  It's more stringent.  It

9    requires discovery motions to contain a certification that

10   there was a telephonic or in-person discussion, who was there,

11   when was it, where was it; that certification has to be in

12   there, or through no fault of the movant, the discussion

13   couldn't happen.  A lot of counsel, including veterans in this

14   district, don't understand that, and they think that an email

15   exchange is sufficient.  It might be under the federal rule,

16   but not under the local rule.

17        So I trust that if you have meaningful 37.2

18   discussions and if those subpoenas are overbroad, if they're

19   ridiculous, that maybe you can come to some agreement on that

20   and save yourselves the time of everybody, the time of motion

21   practice.

22        Plaintiff's counsel, you'll be reasonable in those

23   discussions, won't you?

24        MR. GOLDSTEIN:  Absolutely, Judge.

25        THE COURT:  Leading question, maybe a little unfair,

1   but you represent your clients.  But I really think that

2   motions that are so obviously going to be granted don't really

3   belong here because reasonable counsel should come to

4   agreement.

5             So I know that's not a satisfactory answer to you --

6             MS. GILBERT:  Your Honor --

7             THE COURT:  -- Ms. Gilbert, but that's where we are.

8             MS. GILBERT:  Sure.  I suppose I'm going -- I'm not

9   going back.  I'm more than happy to meet and confer and will

10  certainly abide by the local rules on that front.

11            What I was stating is that our ability to engage in

12  those meet-and-confers or to file a motion to quash is

13  hindered by the fact that if we engage in the litigation

14  process, that will -- that will be a knock against us in the

15  factors considered on the motion to compel arbitration --

16            THE COURT:  Maybe.

17            MS. GILBERT:  -- so I'm concerned that if we continue

18  to engage in the discovery process, as we will since the stay

19  has not been granted, that we will somehow be prejudiced on

20  our motion to compel arbitration.

21            THE COURT:  Trust the process.  Trust Judge Tharp to

22  get to the right result, and if you have a winning result, if

23  it's the right result, you'll get it.  That's all I'll say

24  about that.

25            I will -- I will in my order, it will be a very brief

1   order, but I will make some reference to that, that I think --
2              MS. GILBERT:   Thank you, Judge.
3              THE COURT:   -- everybody came here in good faith, and
4   I think it's a little unusual, our ruling today, it's a
5   product of what's gone on before, but that it is without
6   waiver of your position on the motion to compel arbitration.
7   I think Judge Tharp will understand that.
8              MS. GILBERT:   Thank you, Judge.
9              THE COURT:   Trust the process.
10             Anything else, Ms. Gilbert?
11             MS. GILBERT:   Nothing from me.   Thank you, Judge, for
12  your time today.
13             THE COURT:   Okay.   Terrific.
14             Then I think we're done, but we'll just go around the
15  room.
16             Mr. Goldstein, Mr. Edelman, anything else for
17  plaintiff?
18             MR. EDELMAN:   No, your Honor.
19             THE COURT:   Thank you.
20             Mr. Daugherty, anything else from 777 and Tactical?
21             MR. DAUGHERTY:   No, your Honor.   Thank you.
22             THE COURT:   Ms. Gilbert, anything else from Rosebud?
23             MS. GILBERT:   Nothing from Rosebud.   Thank you.
24             THE COURT:   Okay.   Rosebud.   That can be the last
25  word of today's hearing.   Rosebud.

1        We're adjourned.  Thank you.

2        MR. EDELMAN:  Thank you, Judge.

3      (Which were all the proceedings heard.)

4                    CERTIFICATE

5      I certify that the foregoing is a correct transcript from

6    the digital recording of proceedings in the above-entitled

7    matter to the best of my ability, given the limitations of

8    using a digital-recording system.

9
     */s/Kathleen M. Fennell*                 *April 20, 2023*
10   _____          _____
11   Kathleen M. Fennell                Date
     Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25